SHALLAL v CATHOLIC SOCIAL SERVICES OF WAYNE COUNTY

Docket No. 103125. Argued April 9, 1997 (Calendar No. 15). Decided
     July 30, 1997.

Janette Shallal brought an action in the Wayne Circuit Court against
     Catholic Social Services of Wayne County and its president,
     Thomas D. Quinn, alleging retaliatory discharge in violation of the
     Whistleblowers' Protection Act, MCL 15.361 *et seq.*; MSA 17.428(1)
     *et seq.* The court, John H. Hausner, J., granted summary disposition
     for the defendants, finding no evidence that the plaintiff was about
     to report a violation of law at the time of her firing. The Court of
     Appeals, JANSEN, P.J., and M. J. TALBOT, J. (WHITE, J., concurring in
     part and dissenting in part), affirmed in an unpublished opinion per
     curiam, concluding, as a matter of law, that no reasonable person
     could have believed that the plaintiff was about to report a viola-
     tion for purposes of the act (Docket No. 155006). The plaintiff
     appeals.

     In an opinion by Justice CAVANAGH, joined by Justices BOYLE,
     RILEY, and WEAVER, the Supreme Court *held*:

     The plaintiff presented sufficient facts upon which reasonable
     minds could conclude that she was about to report a suspected vio-
     lation. However, because she used the threat of reporting the
     defendant to force him to allow her to keep her job, no reasonable
     juror could conclude there was a causal connection between her
     firing and the protected activity.

     1. MCL 15.361 *et seq.*; MSA 17.428(1) *et seq.* does not require a
     plaintiff to actually report a suspected violation. An employee
     "about to report" receives the same level of protection as one who
     has actually reported to a public body. The plaintiff's conditional
     threat to her employer was credible evidence that she had finally
     decided that she was going to report him. Giving her employer the
     opportunity to correct his behavior does not in any way affect
     whether she had formed the requisite intent to report her supervi-
     sor. A plaintiff should not be required to say "magic words" in
     order to reap the protections of the statute. It should be sufficient
     that the plaintiff actually threatened to report an employer. The
     plaintiff has met her burden of demonstrating that there is a genu-

ine issue of material fact regarding whether she possessed an actual intent to report defendant's violations.

2. However, the plaintiff failed to establish a causal connection between her actions and her firing. The primary motivation of an employee pursuing a whistleblower claim must be a desire to inform the public on matters of public concern, and not personal vindictiveness. It is clear that the plaintiff used her own situation to extort defendant not to fire her. No reasonable juror could conclude that the plaintiff threatened to report her supervisor out of an altruistic motive of protecting the public. Furthermore, it is clear that the decision to fire plaintiff was made before her threat to her supervisor.

Affirmed.

Justice KELLY, joined by Chief Justice MALLETT and Justice BRICKLEY, concurring in part and dissenting in part, stated that the plaintiff failed to present evidence that she had formed a definite intent to report to a public body in the near future. Without that intent, she could hardly be found to have been about to report, unless she was about to report without knowing it. No reasonable jury could conclude from the fact of the plaintiff's discussions about reporting Quinn and her threats to him that she actually formed the intent to do so in the near future. Summary disposition was properly granted.

*Chambers, Steiner* (by *Michelle J. Harrison* and *Courtney E. Morgan, Jr.*), and *Angela Nicita* for plaintiff-appellant.

*Bodman, Longley & Dahling, L.L.P.* (by *Karen L. Piper* and *Stephen K. Postema*), for defendants-appellees.

CAVANAGH, J. We granted leave to appeal in this case to determine whether the trial court abused its discretion in dismissing Janette Shallal's retaliatory discharge claim under the Whistleblowers' Protection Act. MCL 15.361 *et seq.*; MSA 17.428(1) *et seq.* We find no abuse of discretion and affirm the dismissal.

I

Defendant Catholic Social Services of Wayne County (CSS) is a nonprofit social service agency that provides a wide range of services.[1] Plaintiff Shallal worked for CSS as an adoption department supervisor under a termination "for cause" employment contract. This suit arises out of her claim against CSS for retaliatory discharge.

In late 1986, the CSS Board of Directors appointed defendant Thomas D. Quinn to the position of CSS president. Quinn's alleged lack of expertise prompted some members of the staff to write a letter to the board opposing the appointment. Despite the opposition, Quinn began his presidency in January 1987.[2]

Approximately one year into Quinn's tenure, allegations arose that Quinn was drinking on the job and misusing agency funds in violation of agency rules.[3] Shallal discussed the need to report to her supervisor and other staff members. She also discussed her concerns about Quinn's violations with an honorary CSS-Board Member, Mr. Ryan. Ryan suggested that Shallal report Quinn's violations to the board and to accrediting bodies, presumably in the DSS. Shallal never took

[1] For example, the State of Michigan, through the Department of Social Services, licenses CSS to receive children for placement in private family homes for foster care or adoption. MCL 722.111(c); MSA 25.358(11)(c).

[2] After his appointment, the signers of the letter became known as "Quinn's hit list." Shallal was one of the signers. She claims a striking correlation exists between employees who signed the letter and those who were later terminated, forced to retire, demoted or transferred during the course of Quinn's presidency.

[3] Staff members learned that Quinn and his family attended a conference in Hawaii, paid for by CSS. Quinn allegedly had a small refrigerator in his office that he stocked with beer and wine. He also charged allegedly excessive amounts on his agency credit card at a local restaurant and pub.

action, however, because she feared that her job would be jeopardized.

Before her employment with CSS was terminated, Shallal supervised the adoption of a baby, Ray Glover. Soon after the placement, Shallal learned that Ray's former foster mother had visited Ray and reported seeing bruises on his face, neck, and hands. In retrospect, it appears that Shallal should have reported the allegation to the DSS. A case worker did check on Ray within thirty days of the allegation; however, no official action was taken, there being only minor scratches visible on Ray. Several weeks later, however, Ray was rushed to the hospital, nearly dead from "shaken baby syndrome." Today, he remains in a chronic vegetative state with severe, permanent brain damage.

When Shallal notified the DSS about Ray's injuries, it investigated and cited CSS with violations of several agency rules and regulations. It criticized Shallal for her inadequate response to the first report of abuse, her approval of an inadequate adoption home evaluation, and her failure to coordinate house visits. The DSS faulted Shallal for placing improper emphasis on race in the placement process. The report was equally critical of CSS, listing several institutional failures.

As is their practice, DSS officials met with defendant Quinn before issuing a formal written report on April 19, 1991. They did not specifically recommend Shallal's dismissal. Shallal alleges that, in the past, comparable employee errors did not result in discharge.

After the meeting with DSS officials, Quinn called Shallal into his office. The ensuing discussion became heated. Shallal stated her intention to report Quinn's

abuses of alcohol and agency funds if he failed to, in her words, "straighten up."[4]

Quinn decided to discharge Shallal, citing the DSS report as support. He ordered Timothy Kluka, plaintiff's direct supervisor, to fire her. Kluka refused, feeling he had insufficient information to give as a reason to dismiss. He also believed Shallal's termination would have negative implications for the staff and the agency. Instead, Kluka resigned from his position that day.

On April 24, 1991, Patrick Heron dismissed plaintiff for gross misconduct and negligence in supervising the adoption of Baby Ray. Quinn has since resigned from his position as president.

Plaintiff filed this suit on July 22, 1991, alleging a breach of her employment contract and violation of the Whistleblowers' Protection Act. With respect to the latter claim, the trial court found that any threats plaintiff made to report Quinn were contingent on his continued violation. It also found no evidence plaintiff was "about to" report a violation. It then granted summary disposition for defendants under MCR 2.116(C)(10).

The Court of Appeals affirmed in a two-to-one decision.[5] It reasoned that the Whistleblowers' Protection Act requires a plaintiff to be "near to an action, near to the performance, or in readiness to report the alleged misconduct of defendant Quinn." Unpublished opinion per curiam, issued February 28, 1995 (Docket No. 155006), slip op at 1. The Court of Appeals found

---

[4] Shallal met with DSS officials after her termination. However, she did not report Quinn's drinking or abuse of agency funds.

[5] The dissenting judge argued that plaintiff's testimony created a question of fact regarding whether she was about to report a violation.

that plaintiff failed to satisfy the immediacy require-
ment, because her threat was contingent on the per-
petuation of Quinn's alleged misconduct. The Court
concluded as a matter of law that no reasonable per-
son could have believed that plaintiff was about to
report a violation for purposes of the act.

II

The party bringing a motion for summary disposi-
tion under MCR 2.116(C)(10) bears the initial burden
of supporting its position with affidavits, depositions,
admissions, or other documentary evidence. *Quinto v
Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314
(1996). The burden then shifts to the nonmoving
party to go beyond the pleadings to show the exis-
tence of a genuine issue of material fact. *Id.*

The trial court views affidavits and other documen-
tary evidence supporting a (C)(10) motion in a light
most favorable to the nonmoving party. *Quinto* at
362. A party is entitled to summary disposition if the
evidence shows that there is no genuine issue of
material fact to resolve at trial. *Id.*

> To determine if a genuine issue of material fact exists,
> the test is "whether the kind of record which might be
> developed, giving the benefit of reasonable doubt to the
> opposing party, would leave open an issue upon which rea-
> sonable minds might differ." [*Skinner v Square D Co*, 445
> Mich 153, 162; 516 NW2d 475 (1994), quoting *Farm Bureau
> Mutual Ins Co v Stark*, 437 Mich 175, 184-185; 468 NW2d
> 498 (1991).]

Defendants offered deposition testimony to support
their motion for summary disposition. Consequently,
in order to survive the motion, Shallal had to provide

documentary evidence establishing the existence of a genuine issue of material fact.

III

Section 2 of the Whistleblowers' Protection Act provides in part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports *or is about to report*, verbally or in writing, a violation or a suspected violation of a law or regulation . . . . [MCL 15.362; MSA 17.428(2) (emphasis added).]

To establish a prima facie case, it must be shown that (1) the plaintiff was engaged in protected activity as defined by the Whistleblowers' Protection Act, (2) the plaintiff was discharged, and (3) a causal connection existed between the protected activity and the discharge. *Terzano v Wayne Co*, 216 Mich App 522, 526; 549 NW2d 606 (1996).

It is undisputed that Shallal was discharged on April 24, 1991. Therefore, to meet her prima facie burden at the hearing, she needed only to provide facts from which one could reasonably conclude that (1) she had been engaged in protected activity and (2) the activity was causally connected to her discharge.

An employee is engaged in protected activity under the Whistleblowers' Protection Act who has reported, or is about to report, a suspected violation of law to a public body. It is undisputed that Shallal did not report a suspected violation of law to a public body

before her discharge.[6] Hence, Shallal had the burden of establishing that a question of fact existed regarding whether she was "about to" report Quinn's violations to a public body. Our task is to determine if plaintiff met her burden. To accomplish that, we examine the Whistleblowers' Protection Act.

The cardinal rule of all statutory construction is to identify and give effect to the intent of the Legislature. *Turner v Auto Club Ins Ass'n*, 448 Mich 22, 27; 528 NW2d 681 (1995). The first step in discerning intent is to examine the language of the statute in question. *Auto Club Ins Ass'n v Hill*, 431 Mich 449; 430 NW2d 636 (1988). We read the language according to its ordinary and generally accepted meaning. Judicial construction is authorized only where it lends itself to more than one interpretation. *Frame v Nehls*, 452 Mich 171; 550 NW2d 739 (1996). We also consider that remedial statutes, such as the Whistleblowers' Protection Act, are to be liberally construed, favoring the persons the Legislature intended to benefit. *Dudewicz v Norris Schmid, Inc*, 443 Mich 68, 77; 503 NW2d 645 (1993).

A plain meaning reading of the act shows that an employee "about to" report receives the same level of protection as one who has reported to a public body. The plain language also restricts recovery under the act by requiring a nonreporting employee to establish being "about to" report by offering clear and convincing evidence. MCL 15.363(4); MSA 17.428(3)(4). The face of the statute, however, does not explain what constitutes "about to" report, thereby lending itself to

---

[6] Shallal did not report Quinn's alleged violations after her termination, either.

more than one interpretation. Consequently, we examine the purpose of the act for guidance.

This Court has noted that the Whistleblowers' Protection Act's main purpose is to alleviate "the inability to combat corruption or criminally irresponsible behavior in the conduct of government or large businesses." *Dudewicz* at 75. While employees are often in the best position to report violations of law, they are too frequently reluctant to do so for fear of retribution. *Id.* The act prohibits future employer reprisals against whistleblowing employees for the purpose of encouraging employees to report violations. *Id.*

Legislative analysis indicates that the "about to" report language was added to the bill to protect conscientious employees who intended to, but were discharged in retaliation before they could, report. House Legislative Analysis, HB 5088, 5089, February 5, 1981. *Webster's* defines "about" as "on the verge of" when followed by an infinitive, such as "to leave," or in this case, "to report." *Random House Webster's College Dictionary*, 1995, p 4.

The analysis also evidences a legislative recognition that the "about to" report language was a potential source of controversy. *Id.* In fact, legislative opposition to the bill questioned:

> How does one establish that a person was "about to" do something? This language is an open invitation for disgruntled employees or former employees to claim that their treatment by an employer has been illegal. It could become difficult or impossible to fire or discipline employees. [House Legislative Analysis, HB 5088, 5089, February 5, 1981, p 2.]

In response, the bill's proponents noted:

> There is never any foolproof way of guarding against
> false claims of discrimination, but it would be unreasonable
> to deny protection to the conscientious because that shelter
> might be used by the unscrupulous. House Bill 5089 does
> contain significant safeguards against employee abuse of its
> provisions by requiring that an action be commenced within
> 90 days of the occurrence of the alleged violation and by
> specifying that an employee who claims to have been about
> to report a violation must give clear and convincing evi-
> dence to this intention. [*Id.*]

Thus, the implication is that the language of the Whistleblowers' Protection Act intentionally reduces employee protection the more removed the employee is from reporting to a public body.[7]

IV

Plaintiff Shallal alleges that she was engaged in protected activity under the Whistleblowers' Protection Act because she was "about to" report Quinn's abuse of alcohol and agency funds to the DSS. She asserts that Quinn's activities violated DSS agency rules. She supports her claim with deposition testimony that describes her confronting Quinn with his violations. She also provides entries from her personal calendar that identify by date the people she spoke with about her desire to report Quinn.

Shallal alleges that Quinn called her to his office on April 17, 1991, following his meeting with DSS officials. When the discussion became heated, she told Quinn:

> [I]t's all your fault. This agency is going down the drain
> because you're the one that has no interest, has no commit-

---

[7] Malin, *Protecting the whistleblower from retaliatory discharge*, 16 U Mich J L Ref 277, 305 (1983).

ment. You're so busy drinking and misusing money that you don't care.

And if you don't straighten up . . . I will report [you] to the department, to the board, anybody, everybody.

After her termination, Shallal stated that she tried to retrieve what "actually happened" from her memory. She also said that she had "made some mental notes of conversations and dates . . . that [stuck] out in [her] mind."

Shallal supported her mental notes with calendar entries, which she read at her deposition.

On January 25, I went to lunch with Ted Goldberg and my dictation says, "talked about reporting and confronting Tom."

\*     \*     \*

On February 21, it says, "talked to Charlie G. about reporting Tom. We're all enablers."

\*     \*     \*

On March 22, I have "scheduled lunch with Mary Therese Lamanek." That was the lunch she and I discussed—I did not have any notation . . . . Basically [we talked] about problems in the agency, reporting Tom; we can't let this thing go on and on.

\*     \*     \*

On April 10, when Tim and I were coming back from meeting in Lansing, the federation meeting, I have notated, "talked to T.K. about Tom wanting to fire me. We need to report him." And I had slash (/) "DSS."

In its decision, the Court of Appeals reasoned that the trial court properly dismissed Shallal's retaliatory discharge as a matter of law.

> [N]o reasonable person could conclude that plaintiff was near to an action, near to the performance, or in readiness to report the alleged misconduct of defendant Quinn. . . . Plaintiff's words, "if you don't straighten up . . . I will report [you]," belie any sense of immediacy. [Slip op at 1.]

The Court further noted that Shallal's deposition testimony indicated that "she threatened to report him *if* he did not shape up, thereby giving him an opportunity to change and avoid being reported." *Id.*

The employee bears the burden of establishing that being about to act on a belief that a report to a public body was warranted. The employee's proof, however, need not consist of a concrete action to satisfy the "about to" report element. See *Chandler v Dowell Schlumberger, Inc*, 214 Mich App 111, 120; 542 NW2d 310 (1995).

We hold that the plaintiff has failed to make out a prima facie case under the Whistleblowers' Protection Act. However, we disagree with the Court of Appeals that plaintiff's statement, "if you don't straighten up . . . I will report [you]," coupled with her other actions, does not satisfy the "about to report" language under the act. Rather, we hold that plaintiff failed to establish a causal connection between the protected activity and her firing because she knew that she was going to be fired before she confronted her supervisor; thus, she used the information she had about the defendant's illegal activities as a guise to force the defendant to allow her to keep her job.

V

Unlike whistleblower statutes in other jurisdictions, Michigan provides unique protection to its citizens because it does not require the plaintiff to have actu-

ally reported the suspected violation. For example, "the federal whistleblower statute requires that a plaintiff pursue administrative remedies, including filing a complaint with the Office of Special Counsel. This step is mandatory. 5 USC 1214(a)(3)." *Williams v West*, unpublished opinion of the northern district of California, decided July 23, 1996 (Docket No. C-95-1516 SI), 1996 US Dist LEXIS 10654 *14 (ND Cal, 1996). Other jurisdictions only protect public employees. See, e.g., *Clark v Modern Group Ltd*, 9 F3d 321 (CA 3, 1993) (the whistleblower protection statute only applies to public employees in Pennsylvania). However, as we have previously noted, the plain meaning of Michigan's Whistleblowers' Protection Act shows that an employee "about to report" receives the same level of protection as one who has actually reported to a public body.

The dissent states that "no reasonable jury could conclude from the fact that plaintiff discussed reporting Quinn and threatened him, that she had decided actually to do it and do it in the near future." *Post* at 627. We disagree. Plaintiff's conditional threat to her employer was credible evidence that she had finally decided that she was going to report him. Giving her employer the opportunity to correct his behavior does not in any way affect whether she had formed the requisite intent to report her supervisor. In fact, her threat furthered the public policy goal of the statute, which is to combat the corruption or criminally irresponsible behavior of employers. A plaintiff should not be required to say "magic words" in order to reap the protections of the statute. It should be sufficient that plaintiff actually threatened to report her employer.

"[W]histleblower statute[s] [are] analogous to antiretaliation provisions of other employment discrimination statutes and therefore should receive treatment under the standards of proof of those analogous statutes. [Courts] agree[] that the policies underlying these similar statutes warrant parallel treatment here, and other courts faced with like issues have similarly responded." *Rouse v Farmers State Bank of Jewell, Iowa*, 866 F Supp 1191, 1204 (ND Iowa, 1994). By analogy, the public policy concerns of whistleblower statutes have been echoed in the similar area of federal law under the False Claims Act, 31 USC 3730. This section of the act "might properly be characterized as the 'whistleblower' provisions of the false claims statute." *Southern California Rapid Transit Dist v Los Angeles Co Superior Court*, 30 Cal App 4th 713, 724; 36 Cal Rptr 2d 665 (1994). The False Claims Act (or "qui tam" violations)[8] have existed in various forms since 1863. They empower private citizens to bring suits on behalf of the government against persons who knowingly present false or fraudulent claims to the government for approval or payment. The act is "designed to encourage citizens to ferret out fraud on the federal government . . . ." *Mikes v Strauss*, 889 F Supp 746, 751 (SD NY, 1995).

---

[8] "Qui tam" is abbreviation of Latin phrase "qui tam pro domino rege quam pro si ipso in hac parte sequitur" meaning "Who sues on behalf of the King as well as for himself." It is an action brought by an informer, under a statute which establishes a penalty for the commission or omission of a certain act, and provides that the same shall be recoverable in a civil action, part of the penalty to go to any person who will bring such action and the remainder to the state or some other institution. It is called a "*qui tam* action" because the plaintiff states that he sues *as well* for the state as for himself. [Black's Law Dictionary (6th ed), p 1251.]

To sustain an action under the False Claims Act, the plaintiff must prove "1) that she engaged in conduct protected under the statute, 2) that defendants were aware of her conduct, and 3) that she was terminated in retaliation for her conduct." *Id.* at 752. Under the first element, "plaintiff need not have actually filed suit under the FCA to receive the protection accorded by [the statute]." *Id.* Observing the defendant's illegal action "and confronting defendants with her observations" is sufficient to demonstrate that the plaintiff was engaged in a protected activity. *Id.* The same should be true of this case. Plaintiff observed the illegal action and confronted defendant with her observations.

Even under the second element, the plaintiff in this case would have satisfied the requirements for sustaining a qui tam suit. The United States Court of Appeals for the Fifth Circuit has adopted a strict approach which requires that "before termination the employee must expressly accuse the employer of defrauding the government or threaten a qui tam action based thereon . . . ." *Id.* at 753. Other courts have not required the plaintiff to meet such strict standards. For example the *Mikes* court has stated:

> [A]n employee must supply sufficient facts from which a reasonable jury could conclude that the employee was discharged because of activities which gave the employer reason to believe that the employee was contemplating a qui tam action against it. To insist upon an express or even an implied threat of such action would impose a requirement which is wholly unrealistic in an employment context. Despite the protection afforded by [the statute]—of which most employees are doubtless unaware—those who tell their employers they are preparing to sue them on behalf of

a defrauded government can scarcely expect a long and happy tenure. [*Id.*]

However, under either approach, plaintiff in our case would have met the requirements for a qui tam action under the whistleblower provision of the False Claims Act. Plaintiff made an *express* threat to her employer that she would report him if he did not shape up. This clearly evidences an intent to report, and thus satisfies the "about to report" language of the Whistleblowers' Protection Act.

The dissent states that the express threat to her employer was insufficient in part because she did not take her supervisor's advice and actually report because "she feared for her job," she "did not call her state representative," she did not "report after her termination," nor did she specifically state that she had "decided to report Quinn." *Post* at 625. Not one of these things is required by the statute. Confronting a supervisor with a threat of a report serves to promote the public policy of whistleblower statutes. Certainly such a threat should demonstrate that the employee has an actual intent to report the violation. As stated by the Supreme Court of Texas:

Dissenters and whistleblowers rarely win popularity contests or Dale Carnegie awards. They are frequently irritating and unsettling. These qualities, however, do not necessarily make their views wrong or unhelpful. . . . [T]he employee's report should not be limited to some outside official . . . . [I]nternal reporting of wrongdoing should be encouraged, so that an employer may have an opportunity to investigate and remedy problems before involving outside authorities. . . . The underlying policy goals to avert harm to the public may be just as effectively served by communication within an organization . . . . [*Winters v Houston Chronicle*

*Publishing Co,* 795 SW2d 723, 733 (Tex, 1990)  (Doggett, J.,
concurring).]

We recognize that if an employee chooses to pro-
ceed with an action she must report the violation to a
public body. However, the statute is very clear that
conduct short of actually reporting is also protected if
it can be demonstrated that the employee was "about
to" report. The dissent would punish the plaintiff for
not actually reporting the violation, even though the
Michigan statute does not require such action. The
United States Court of Appeals for the Eighth Circuit
has held that in order to prove a prima facie case of
retaliation under a whistleblower statute, the plaintiff
must "specifically . . . show [] that the employer had
knowledge of the employee's protected activity
. . . ." *Rouse, supra* at 1206. Under this strict stan-
dard, plaintiff's threat would be considered protected
activity.[9]

---

[9] Even under the dissent's reasoning, plaintiff has met her burden of
demonstrating that there is a genuine issue of material fact regarding
whether she possessed an actual intent to report defendant's violations.
The dissent states that "the actions [to which] I refer  . . . , significant by
their absence, represent the state of the plaintiff's mind. If she had taken
any of them, it would serve to convince a jury that she was about to
report." *Post* at 625.

In this case, there were many things "in addition" to her express threat
to report that demonstrate that there is a triable question of fact regarding
whether she intended to report Quinn. While it is true that plaintiff had
thought about reporting him for years, a reasonable jury could conclude
that her mere thoughts changed to actual intent to report just before her
confronting Quinn: (1) she discussed the violations with her supervisor
and honorary board member, (2) she discussed reporting her supervisor
with her co-workers, as evidenced by her diary entries, and (3) she wrote
in her calendar, "We need to report him . . . /DSS." What more could
plaintiff have done to make it clear that she was about to report? Con-
trary to the implications of the dissent, the law does not require her to
"actually report." *Id.* at 624. The law does not require that she "call her
state representative to learn where to report the abuse." Finally, the law

Therefore, on the basis of these facts, we hold that plaintiff's express threat to the wrongdoer that she would report him if he did not straighten up, especially coupled with her other actions, was more than ample to conclude that reasonable minds could find that she was "about to report" a suspected violation of the law to the DSS.

VI

However, proving plaintiff was engaged in protected activity does not end the inquiry. We hold that plaintiff failed to establish a causal connection between her actions and her firing. Many courts have held that a plaintiff is precluded from recovering under a whistleblower statute when the employee acts in bad faith. See, e.g., *Melchi v Burns Int'l Security Services, Inc*, 597 F Supp 575 (ED Mich, 1984), *Wolcott v Champion Int'l Corp*, 691 F Supp 1052 (WD Mich, 1987). The primary motivation of an employee pursuing a whistleblower claim "must be a desire to inform the public on matters of public concern, and not personal vindictiveness." *Id.* at 1065.

> Where, however, an employee . . . keeps the matter quiet for more than a year, eventually revealing it not to the appropriate authorities or even to others for the purpose of preventing public injury, but rather for some other limited and private purpose, however laudable that purpose may appear to the employee, no such protection is afforded. [Otherwise] we would be discouraging disclosure and correction of unlawful or improper acts by encouraging employees to "go along" and then keep quiet reserving comment or disclosure until a time best suited to the advancement of their own interests. [*Id.* at 1065-1066.]

---

does not require that she "state[] that she had decided to report Quinn" soon. *Id.* at 625.

Like *Wolcott*, it is clear that plaintiff used her own situation to extort defendant not to fire her. While not all circumstances potentially giving rise to an extorsive motive will preclude summary disposition, see *LaFond v General Physics Services Corp*, 50 F3d 165 (CA 2, 1995), in this case, no reasonable juror could conclude that plaintiff threatened to report Quinn out of an altruistic motive of protecting the public. Furthermore, it is clear that the decision to fire plaintiff was made before her threat to Quinn *and* that plaintiff knew of this decision as evidenced by her calendar entry, which stated, "talked to T.K. about Tom wanting to fire me. We need to report him." Plaintiff cannot use the whistleblowers' act as a shield against being fired where she knew she was going to be fired before threatening to report her supervisor. To hold otherwise "would encourage other employees to hold off blowing the whistle until it becomes most advantageous for them to do so. Plaintiff has offered no evidence which suggests that the Michigan Legislature intended the Whistleblowers Act to be used as an offensive weapon by disgruntled employees." *Wolcott, supra* at 1066.

VII

For these reasons, we hold that plaintiff presented sufficient facts upon which reasonable minds could conclude that she was "about to report" a suspected violation. However, because she used the threat of reporting defendant to force him to allow her to keep her job, no reasonable juror could conclude there was a causal connection between her firing and the protected activity. Therefore, the decision of the Court of Appeals is affirmed.

BOYLE, RILEY, and WEAVER, JJ., concurred with CAVANAGH, J.

KELLY, J. (*concurring in part and dissenting in part*). I agree with the majority that the plaintiff has failed to make out a prima facie case under the Whistleblowers' Protection Act. However, I disagree that the evidence advanced to convince the factfinder that plaintiff was about to report suffices to establish a jury question.

I

Plaintiff Shallal alleges that she was engaged in protected activity under the act because she was "about to" report defendant Quinn's abuse of alcohol and agency funds to the Department of Social Services. She asserts that Quinn's activities violated DSS agency rules. She supports her claim with deposition testimony that describes her confronting Quinn with his violations. She also provides entries from her personal calendar that identify by date the people she spoke with about her desire to report Quinn.

I would hold that Shallal failed to present evidence that she had formed a definite intent to report to a public body in the near future. Without that intent, she could hardly be found to have been "about to" report, unless she was "about to" do it without knowing it.

Shallal established that she learned of Quinn's abuses and recognized the need to correct the problem. However, recognizing that something must be done, and deciding without contingencies to do it, are distinct steps. What constitutes "about to" report is a function of the facts and circumstances of each case. Normally, the determination will involve a plaintiff's

state of mind and will be a question for the jury. However, as the Court of Appeals noted, there are cases in which the plaintiff's proofs are so lacking on this element that no reasonable juror could conclude that plaintiff was about to report. Unpublished opinion per curiam, issued February 28, 1995 (Docket No. 155006), slip op at 1. I see this as one of those cases. Like well-intentioned New Year's resolutions never acted upon, Shallal's showing that she recognized the offenses, and desired to report them if they did not end, are not evidence that she was "about to" report.

I am unpersuaded by plaintiff's reliance on *Lynd v Adapt, Inc*, 200 Mich App 305; 503 NW2d 766 (1993). Rather, I believe that Shallal's actions are distinguishable from those of the employee in *Lynd*. Betty Lynd presented evidence from which a reasonable jury could conclude that she had definitely decided to report employer misdeeds in the near future. The Court of Appeals reasoned that she

> made several attempts to remedy what she believed to be improper practices by reporting the alleged abuse to her supervisors and the organization's board of directors. She also contacted her state representative to learn whom she should contact to report the suspected abuse. [*Id.* at 306.]

The Court considered the fact that she reported the employer misdeeds after her termination. However, it correctly noted that an employee need not actually report after termination to be covered under the act's "about to" report language. *Id.*

Whereas Betty Lynd reported to her supervisor and her employer's board of directors, Janette Shallal merely discussed what could be done about Quinn with her supervisor and an honorary board member.

She did not take the latter's advice to report Quinn because she feared for her job. Perhaps she was not "about to" report, for the same reason. Unlike Lynd, Shallal did not call her state representative to learn where to report the abuse. Although it is not dispositive, Shallal did not report after her termination, either, as did Lynd. Finally, she never stated that she had decided to report Quinn in the near future.[1]

The majority disagrees with my finding insufficient evidence because plaintiff failed to report before or after termination, to get information on how to report or even decide to report soon. *Ante* at 619-620. The majority points out that the statute does not require any of these actions. *Id.*

Certainly, the statute requires no specific action. However, the actions I refer to, significant by their absence, represent the state of the plaintiff's mind. If she had taken any of them, it would serve to convince a jury that she was about to report. Any of them would have been evidence that Shallal had formed the intention to report to a public body with immediacy.

---

[1] In her deposition, Shallal was asked if her testimony was that she had been "about to" report to a public body for a period of time, two or three years. She responded:

> I think when this—these things came up, you know, those wrongdoings, and when they came up, and the feeling of reporting was thought about, it was—again, it was like trying to confirm the information, trying to find who would be the best to report it to, who would intervene in the most, you know, best way. And I think it took a while to be able to decide exactly when to do it. I wanted to do it but when it [was], you know—again, it was all part of a process that I felt . . .

The deposer then repeated the question and Shallal responded "yes." This falls short of evidence that Shallal definitely had formed the intent to report the violations to a public body with some immediacy.

As the majority notes, the common meaning of "about to" suggests a sense of immediacy. *Ante* at 612. (*"Webster's* defines 'about' as 'on the verge of' when followed by an infinitive . . . .") None of the actions Shallal did take indicates an intention to report soon to a public body. Thus, I respectfully disagree with the majority's inference that my position reads into the statute something that is not there.

I find the majority's analogy to the False Claims Act unpersuasive. As the majority notes, what constitutes protected activity under that act differs from what constitutes protected activity under the Whistleblowers' Protection Act. *Ante* at 618. Under the FCA, evidence that an employee observed and confronted a defendant with her observations suffices to get the case to a jury. *Id.* Under the whistleblowers' act, however, there must be evidence that the employee reported or was about to report.

Since the actions required of employees under the FCA are clearly less stringent than those required under the Whistleblowers' Protection Act, the majority's analogy loses force. If the Michigan Legislature intended to protect an employee who confronts an employee, as the FCA does, it could have done so. The New York Legislature wrote a stronger whistleblowers' law than ours.[2] But the Michigan Legislature has seen fit to require either actual reporting or proof

---

[2] New York's equivalent to Michigan's Whistleblowers' Protection Act provides that an employer cannot take retaliatory action against an employee if the employee

discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law . . . . [New York Labor Law 740(2)(a).]

by clear and convincing evidence that an employee was "about to report." It has refused to bring within the protection of the act an employee who discusses reporting and who approaches the employer and threatens to report, but takes no further action. Perhaps this is regrettable and should be remedied. However, the lawmaking that is appropriate is legislative, not judicial.

In conclusion, no reasonable jury could conclude from the fact that plaintiff discussed reporting Quinn and threatened him, that she had decided actually to do it and do it in the near future. Without some evidence of that decision, plaintiff could not have been "about to" report. Therefore, I conclude that the trial judge properly granted defendant's motion for summary disposition under MCR 2.116(C)(10).

II

I would not reach the issue whether a causal relationship existed between the discharge and the protected activity. Rather, I would dismiss plaintiff's claim because she failed to present evidence sufficient for a jury to find that she was about to report.

MALLETT, C.J., and BRICKLEY, J., concurred with KELLY, J.