*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* DOROTHY MARIE TALANDA TRUST.

---

TIMOTHY WAALKES, Trustee of the DOROTHY MARIE TALANDA TRUST, CAMILLE FATH, EDMUND TALANDA, and KATHLEEN POTTS,

UNPUBLISHED
May 12, 2022

Appellees,

v

No. 356293
Kent Probate Court

LARAINE GOETTING and MICHELE KRAFT,

LC No. 20-207551-TV

Appellants,

and

SUSAN MINEHART and ANNETTE TALANDA BRENNAN,

Other Parties.

---

Before: GLEICHER, C.J., and RONAYNE KRAUSE and BOONSTRA, JJ.

PER CURIAM.

Appellants Laraine Goetting (Goetting) and Michele Kraft (Kraft) appeal by right the probate court's order granting summary disposition under MCR 2.116(C)(10) (no genuine issue of material fact) in favor of appellees Camille Fath (Fath), Edmund Talanda (Edmund), Kathleen Potts (Potts), and Timothy Waalkes (Waalkes), the trustee for the Dorothy Marie Talanda Trust (the trust). We affirm.

-1-

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

During their lifetimes, Edmund[1] and Dorothy Talanda both established revocable living trusts: the Edmund Talanda Trust and the Dorothy Marie Talanda Trust. Each served as the initial trustee of their respective trusts until their deaths. This appeal pertains to the Dorothy Marie Talanda Trust.[2] With the exception of Waalkes (the trustee), the parties are siblings who are beneficiaries of their mother's trust: Goetting, Kraft, Fath, Edmund, Potts, Susan Minehart (Minehart), and Annette Talanda Brennan (Brennan). Fath and Brennan initially acted as co-successor trustees of the trust after their mother's death; however, disagreements with regard to the distribution of assets arose that made it impossible to finalize the administration of the trust. This dispute resulted in a rift developing among the siblings, with Fath, Edmund, Potts, and Minehart on one side, and Brennan, Kraft, and Goetting on the other. In an effort to resolve their differences, the parties participated in a mediation to determine the disposition of the trust's assets.

After an extensive mediation, the mediator made a proposal for the resolution of the remaining issues. That proposal was adopted as a settlement agreement on October 29, 2019. As part of that agreement, Fath and Brennan agreed to resign as cotrustees. Relevant to this appeal, the settlement agreement addressed the sale of a vacant lot owned by the trust (the lot). The settlement agreement provided:

> The vacant lot on Gourdneck Lake will be offered for sale by owner for 30 days, and if not sold then it will be listed for sale as directed by the Trustee of the Trust. In the event the property is listed with an agent for sale, the beneficiaries will defer to the directions of the listing agent.

The lot was the last undeveloped lot located on Gourdneck Lake in Portage, Michigan. In January 2020, the beneficiaries continued to discuss modifications to the settlement agreement. In a January 3, 2020 e-mail, counsel for Brennan sent the beneficiaries a proposal that the trust sell the lot to Kraft and Goetting for $450,000. The proposal stated that the price reflected a 10% discount on the lot's estimated value of $500,000,[3] and was consistent with the beneficiaries' valuation of the other real estate parcels owned by the trust. The proposal specified that Brennan, Goetting, and Kraft had agreed to its terms. The remaining beneficiaries responded and requested $460,000 for the lake lot. Negotiations ended, and the lot remained an asset of the trust.

After Waalkes was appointed as successor trustee in April 2020, both Fath and Brennan provided him with reports containing summaries of trust assets and other information. With regard to the lake lot, Fath's report stated: "In January, [Goetting and Kraft] asked to buy the lot for

---

[1] This Edmund was the father of the sibling parties, including appellee Edmund Talanda.

[2] There is also a dispute involving a cottage held by the Edmund Talanda Trust. That dispute is the subject of the appeal in Docket No. 358074, and will not be addressed in this opinion.

[3] The lot was professionally appraised in May 2019 for $295,000. However, the beneficiaries believed the lot was worth substantially more. An offer by the lot's adjacent neighbors (in the amount of $450,000) was not accepted.

$460,000.00,[4] but declined to sign the agreement. The mediation agreement states that it should be listed with a realtor." The report went on to explain that it was "doubtful that the lot will sell in this economy, but the value should rebound as the economy improves. We may have a family member interested in purchasing the lot." Waalkes testified in his deposition that he did not have an opinion regarding whether Goetting and Kraft had an interest in purchasing the lot. Fath's report was unclear in this regard; however, the settlement agreement was clear that the lot should be listed with a real-estate agent. As a result, Waalkes focused on listing the lot with a realtor. Waalkes contacted a local realtor to list the lot, who opined that the lot was worth approximately $300,000.

On April 15, 2020, Waalkes e-mailed the beneficiaries to inform them that the lot had been listed for $450,000 and advising them that they were welcome to make offers for the lot. Waalkes directed that any interested beneficiaries should contact him and the realtor. Brennan and Goetting responded to thank Waalkes, but he did not receive any other responses or indications of interest.

On May 5, 2020, Waalkes received an offer from an unrelated third party in the amount of $240,000. Waalkes asked the realtor to contact the neighbors to see if they would make any offer for the lot. However, they declined to make an offer at any price. On the basis of advice from the realtor, Waalkes extended a counteroffer to the third party in the amount of $325,000. On May 8, 2020, Waalkes met with Potts and Goetting (one representative from each faction of the feuding siblings) at the family home in Kalamazoo to discuss issues relating to personal property. Fath also arrived to remove some personal items from the home. Waalkes told them about the counteroffer and that the trust was willing to sell the lot for $325,000. The third-party prospective buyer eventually made a counter-offer of $280,000, which Waalkes rejected as too low.

On May 11, 2020, Gary Kaylor (Kaylor), who is Kraft's son, offered to purchase the lot for $325,000. Waalkes accepted that offer. However, Kaylor was unable to obtain the proper financing and the offer lapsed. At that point, Fath contacted Waalkes and expressed her understanding that the sale to Kaylor had fallen through. Waalkes believed that Fath had obtained this information through correspondence with Kaylor or another family member. He confirmed that the offer had lapsed. Fath informed Waalkes that she was willing to pay $325,000 for the lot. Waalkes told her to make an offer to the realtor. Fath submitted a formal cash offer for $325,000 for the lot on May 15, 2020, which Waalkes accepted. The sale of the lot to Fath and her husband closed on May 28, 2020.

In June 2020, Fath, Edmund, and Potts filed a petition with the probate court to enforce the settlement agreement, arguing that Brennan and Goetting had attempted to renegotiate or undermine several of the agreement's provisions. Fath, Edmund, and Potts alleged that, as a result, they had been prevented from receiving assets assigned to them under the agreement and that Waalkes was unable to finalize the administration of the trust. In response, Goetting and Kraft filed a counterpetition, which contended that the sale of the lot was improperly conducted and should be set aside. The parties filed cross-motions for summary disposition, arguing that the probate court should grant their requested relief as a matter of law. After holding a hearing on

---

[4] Fath testified in her deposition that she was referring to the counterproposal for $460,000.

these motions, the probate court ruled in relevant part that the sale of the lot was valid and dismissed the claims raised in the counterpetition. This appeal followed.

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's ruling on a motion for summary disposition. *Auto Club Group Ins Co v Burchell*, 249 Mich App 468, 479; 642 NW2d 406 (2001). When reviewing a motion brought pursuant to MCR 2.116(C)(10), this Court "must consider the pleadings, affidavits, depositions, admissions, and any other documentary evidence in favor of the party opposing the motion." *Baker v Arbor Drugs, Inc*, 215 Mich App 198, 202; 544 NW2d 727 (1996). This Court's "task is to review the record evidence, and all reasonable inferences drawn from it, and decide whether a genuine issue regarding any material fact exists to warrant a trial." *Id*. A genuine issue of material fact exists when the record, "giving the benefit of reasonable doubt to the opposing party, would leave open an issue upon which reasonable minds might differ." *Shallal v Catholic Social Servs of Wayne Co*, 455 Mich 604, 609; 566 NW2d 571 (1997). However, this Court may not "assess credibility" or "determine facts on a motion for summary judgment." *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994).

## III. BREACH OF FIDUCIARY DUTY BY FATH

Appellants argue that Fath breached her fiduciary duties to the trust because, after declining to sell the lot to Goetting and Kraft for $450,000, she later purchased the lot for herself at a lower price. We disagree.

"In general, the duties imposed on the trustee are determined by consideration of the trust, the relevant probate statutes and the relevant case law." *In re Green Charitable Trust*, 172 Mich App 298, 312; 431 NW2d 492 (1988). As a result, "[a] claimed breach of duty and any resulting liability is tested by the facts of each case." *Id*.

The Michigan Trust Code, MCL 700.7101 *et seq*., provides guidance in relation to the specific duties that a trustee owes to beneficiaries of a trust. For example, MCL 700.7801 provides that "the trustee shall administer the trust in good faith, expeditiously, in accordance with its terms and purposes, for the benefit of the trust beneficiaries . . . ." Similarly, MCL 700.7802(1) states that "[a] trustee shall administer the trust solely in the interests of the trust beneficiaries." Moreover, according to MCL 700.7803,

> The trustee shall act as would a prudent person in dealing with the property of another, including following the standards of the Michigan prudent investor rule. If the trustee has special skills or is named trustee on the basis of representation of special skills or expertise, the trustee is under a duty to use those skills.

With regard to a trustee's duty to inform beneficiaries of issues related to the trust, "[a] trustee shall keep the qualified trust beneficiaries reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests." MCL 700.7814(1).

Appellants assert that Fath breached her duty to obtain the highest price available for the lot because she declined their offer to purchase the lot for $450,000, and then bought the lot for herself for $325,000. See *In re Green Charitable Trust*, 172 Mich App at 315 (stating that "[i]n

the context of the sale of real property, there is an obligation to seek the highest price obtainable"). Appellants further assert that Fath's actions deprived the trust of $125,000 to which it was entitled. However, these assertions are not supported by the record.

In December 2019, after the beneficiaries participated in mediation, Brennan, acting as cotrustee, attempted to negotiate the sale of the property to the neighboring property owners. However, these negotiations fell through, and the beneficiaries agreed to list the lot for sale. In January 2020, the beneficiaries continued to negotiate the distribution of the trust assets. Counsel for Brennan sent an e-mail to the attorneys representing the other beneficiaries and the mediator proposing, among other things, that the lot be distributed to Goetting and Kraft for $450,000. The remaining beneficiaries proposed a sale price of $460,000, but Goetting and Kraft did not agree, and the negotiations eventually ceased.

Contrary to appellants' arguments, the January 3, 2020 e-mail was not a formal offer to purchase the lot for $450,000 that Fath rejected on behalf of the trust. Rather, the e-mail contained a set of proposed modifications to the settlement agreement. These modifications were not accepted by three of the beneficiaries, including Fath, and were never incorporated into the settlement agreement.

In any event, even if the January 3 e-mail contained an offer to purchase the property, Fath was not acting as a cotrustee when she declined this proposal. The e-mail was sent to counsel for Fath, Edmund, and Potts, seeking their agreement to the proposed modifications. Those three beneficiaries did not agree to the proposed modifications, but instead proposed that the lot be sold to appellants for $460,000. The record supports the conclusion that Fath was not acting as a cotrustee when the rejection of the proposed modifications was communicated to Brennan; rather, she was acting as one of the beneficiaries who declined to accept the proposed modifications. In her deposition, Fath testified that she was in favor of accepting the proposed $450,000 for the lake lot, but that Potts was in favor of countering for $460,000. Fath ultimately agreed with Potts, and the proposed $460,000 sale price was communicated. Fath stated that she believed at the time that the lot was worth more than the appraised value, based on a previous offer made by the neighboring property owners to purchase the lot for $450,000 (which all beneficiaries had agreed to reject) and information she had received from Edmund, who had built a house for his daughter on a nearby lake and was well acquainted with lakefront property in the area. The January 3 e-mail itself stated that the lot was worth $500,000, which shows that Brennan, Kraft, and Goetting also believed that the lot was worth more than the appraised value and their proposed purchase price. Consequently, appellants have not shown that Fath's rejection of this proposal as a beneficiary was a breach of her fiduciary duty as a cotrustee.

Moreover, the record shows that Waalkes informed all beneficiaries that the lot had been listed for $450,000 and invited offers. Despite their claim that they were willing to purchase the lot for $450,000, Goetting and Kraft never made an offer to purchase the lot once it was listed. Kraft acknowledged receiving the April 15, 2020 e-mail from Waalkes but stated that she wanted to see what other offers came in because she wanted to gauge the price. Goetting stated that by the time the lot was listed for sale, as a result of financial constraints, she had a budget of $380,000 for the property, yet made no offers after she was informed that the trust would be willing to sell the property for $325,000. Fath made a cash offer for $325,000 after Kaylor's offer fell through. No beneficiary made any higher offers. Therefore, Fath's offer and subsequent purchase did not

result in any damage to the trust, because the trust ultimately received $325,000, which was the same as the counteroffer proposed to the third party and what Kaylor had offered. This amount was also more than the $300,000 that the realtor had suggested the lot was worth.

Moreover, appellants' assertion that Fath breached her duty to the trust by providing false information to Waalkes is also without merit. In Fath's report to Waalkes, she stated that Goetting and Kraft had offered to buy the lot for $460,000, but had ultimately declined to sign the purchase agreement. Fath acknowledged in her deposition that Brennan's attorney did initially write $450,000 in his proposal e-mail, but that Fath, Edmund, and Potts had countered with a proposed price of $460,000, and that Goetting and Kraft had declined that counter-proposal. Therefore, even if Fath's report was inaccurate in stating that Goetting and Kraft had agreed to $460,000 but had refused to sign the purchase agreement, instead of stating that they had rejected a counter-proposal of $460,000, the salient point was that, whether the price was $450,000 or $460,000, the parties had failed to come to an agreement. Fath's report also indicated that family members may be interested in purchasing the lake lot. As observed by the probate court, Brennan did not mention Goetting and Kraft's possible interest in her report. Waalkes explained that Goetting and Kraft's interest was unclear, but the requirement that the lot be listed for sale was clear. Once the lot was listed, Waalkes notified the beneficiaries of the listing and invited them to make offers. As stated, appellants failed to make an offer once the lot was on the market.

We conclude that Fath did not breach her fiduciary duties to the trust in relation to the sale of the lot. The lot was listed for sale as required by the settlement agreement, all beneficiaries were invited to make offers, and the ultimate sale was for a price that was more than the realtor had opined the lot was worth. Therefore, the probate court properly granted the motion for summary disposition in favor of Fath, Edmund, and Potts, and dismissed the counterpetition's claims related to Fath's fiduciary duties. See *Shallal*, 455 Mich at 609.

## IV. MISREPRESENTATION

Appellants also argue that Fath engaged in misrepresentation regarding their interest in purchasing the lake lot in her report to Waalkes, who succeeded her as trustee. As a result, according to appellants, they suffered damages because Fath was able to purchase the lot for less money than what they would have offered. We disagree.

> The elements of fraudulent misrepresentation are (1) the defendant made a material representation, (2) the representation was false, (3) when making the representation, the defendant knew or should have known it was false, (4) the defendant made the representation with the intention that the plaintiff would act upon it, and (5) the plaintiff acted upon it and suffered damages as a result. [*Novak v Nationwide Mut Ins Co*, 235 Mich App 675, 688; 599 NW2d 546 (1999).]

"A claim of innocent misrepresentation is shown if a party to a contract detrimentally relies on a false representation in such a manner that the injury suffered by that party inures to the benefit of the party who made the representation." *Id*.

As discussed, the information provided in her report to Waalkes was not materially false despite a technical inaccuracy. The report indicated that Goetting and Kraft had attempted to buy

the lot but that no agreement was reached, and that family members may be interested in purchasing the lot. In any event, appellants have not presented any evidence showing that they suffered damages or injury as a result of any inaccuracies in the report. Waalkes informed all beneficiaries that the lot was listed for sale at $450,000, and invited them to make offers. Later, Waalkes told Goetting that the trust was going to make a counteroffer to a third party for $325,000 and that anyone interested in making an offer should contact the realtor. As a result, Goetting and Kraft had the opportunity to submit an offer for the lot; they simply declined to do so, even after at least one of them was informed that the trust was willing to sell for $325,000. Goetting and Kraft did not suffer injury as the result of any inaccuracies in the report, because they were invited to act but failed to do so. See *id*. Therefore, they failed to establish either fraudulent or innocent misrepresentation, and the probate court properly granted summary disposition on these claims. See *Shallal*, 455 Mich at 609.

## V. BREACH OF FIDUCIARY DUTY BY WAALKES

Appellants also argue that Waalkes breached his fiduciary duty as successor trustee by failing to keep them informed with respect to the sale of the lot. We disagree.

By the time that Waalkes was appointed as successor trustee in April 2020, Waalkes was required under the settlement agreement to publicly list the lot for sale with a realtor. He contacted a realtor, and the lot was listed. Waalkes then contacted all of the beneficiaries to inform them of the listing and invited them to submit offers if they were interested. After Waalkes received an offer from a third party, the realtor suggested a counteroffer of $325,000. Waalkes informed Goetting and two other beneficiaries about this counteroffer in May 2020. Therefore, these three beneficiaries knew that the trust was willing to accept $325,000 for the lot. Kaylor, who is Kraft's son, made an offer of $325,000, which Waalkes accepted, but the deal fell through when Kaylor was unable to obtain the appropriate financing. According to Waalkes, Fath contacted him to confirm the status of Kaylor's offer. There is no indication that he specifically sought out Fath to make an offer on the property. There is also no evidence that Goetting and Kraft were somehow prohibited from submitting an offer for $325,000 (or more), or that $325,000 was not a fair price for the lot. The lot was appraised for $295,000 in May 2019, and the realtor opined that anything over $300,000 was a good price.

The record shows that Waalkes followed the direction of the settlement agreement with regard to the sale of the lot. The agreement did not require that he inform every beneficiary about each offer, or advise them that any of them could purchase the lot or that they would have a right of first refusal with respect to any offers received. Rather, the agreement provided that the beneficiaries would defer to the direction of the listing agent. See *In re Green Charitable Trust*, 172 Mich App at 312. In addition, Waalkes informed the beneficiaries that the lot had been publicly listed and for what price, and he invited offers. He also provided updates with regard to the sale when asked. See MCL 700.7814(1). Goetting and Kraft declined to present an offer at any time. Accordingly, Waalkes did not breach any duty with regard to the sale of the lot, and the probate court properly granted summary disposition on this claim. See *Shallal*, 455 Mich at 609.

-7-

## VI. NOTICE

Finally, appellants argue that the probate court erred by granting appellees' motion for summary disposition, because there was a factual dispute regarding whether Kraft had asked Waalkes to provide updates concerning the sale of the lot, and whether Waalkes had failed to do so. We disagree.

According to appellants, Kraft asked Waalkes to keep her informed in regard to the sale of the lot, but he failed to do so. However, in Kraft's affidavit, she acknowledged that she knew that the lot was listed for sale for $450,000. Further, she stated that she was aware of the counteroffer made to the third party. Therefore, even accepting as true Kraft's allegation that she asked Waalkes to keep her informed with regard to the sale of the lot, the evidence shows that she was informed. See *Baker*, 215 Mich App at 202. She could have submitted an offer at any time, but declined to do so. There is no indication that her failure to make an offer was the result of any lack of information.

Appellants argue that Waalkes should have sent the beneficiaries an e-mail to inform them that the trust was willing to sell the lot for $325,000, but, as discussed, they already knew that information. Kraft's son, Kaylor, even presented an offer for $325,000, which Waalkes accepted. Fath's successful bid was for the same price, $325,000. Therefore, Fath's ultimately successful purchase of the lake lot was not the result of keeping the negotiations secret from the other beneficiaries.

Moreover, the assertion that Waalkes should have notified the beneficiaries that the trust was willing to sell the lot for $325,000 contradicts appellants' contention that they would have paid more for the lot. The lot was listed for $450,000, which is the price that they maintain that they would have paid for it. But, again, neither Goetting nor Kraft presented an offer to the realtor at any time, even though they had the opportunity to do so. Accordingly, there is no evidence that appellants were not kept informed of developments involving the sale of the lot or that any lack of information was the cause of their failure to submit an offer. See *Town v Mich Bell Telephone Co*, 455 Mich 688, 698; 56 NW2d 64 (1997) (explaining that "the evidence must create a material issue of fact on which reasonable minds could conclude" that appellants suffered an injury because of a failure to keep them properly informed). As a result, the probate court properly granted summary disposition in favor of Fath, Edmund, and Potts and properly dismissed the claims in the counterpetition with respect to the sale of the lot. See *Shallal*, 455 Mich at 609.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Amy Ronayne Krause
/s/ Mark T. Boonstra