# STATE OF MICHIGAN

# COURT OF APPEALS

BRUCE WHITMAN,

        Plaintiff-Appellee,

v

CITY OF BURTON and CHARLES SMILEY,

        Defendants-Appellants.

FOR PUBLICATION
July 9, 2015
9:00 a.m.

No. 294703
Genesee Circuit Court
LC No. 08-087993-CL

## ON SECOND REMAND

Before: O'CONNELL, P.J., and SAAD and BECKERING, JJ.

SAAD, J.

## I. PROCEDURAL HISTORY[1]

This is the third time we have addressed this case on appeal. Our Court originally adjudicated this alleged Whistleblower Protection Act[2] (WPA) claim in 2011, and our opinion[3] reversed the jury award in plaintiff's favor. We held that the Michigan Supreme Court's *Shallal*[4] decision barred plaintiff from claiming protection under the WPA, because he admitted that his motivation for asserting entitlement to accumulated, unused sick-leave pay under a city ordinance was entirely personal and selfish.[5] We reasoned that, under *Shallal*, plaintiff's private motivations for asserting defendant's non-compliance with the city ordinance disqualified him

---

[1] A summary of the facts relevant to this opinion can be found at *Whitman v City of Burton*, 493 Mich 303, 306–311; 831 NW2d 223 (2013), and at *Whitman v City of Burton*, 293 Mich App 220, 222–228; 810 NW2d 71 (2011).

[2] MCL 15.361, *et seq*.

[3] *Whitman*, 293 Mich App at 220.

[4] *Shallal v Catholic Social Servs of Wayne Co*, 455 Mich 604; 566 NW2d 571 (1997).

[5] Specifically, plaintiff first voiced his opposition to modification of the city ordinance at issue by stating that "my current life style revolves around these very things [i.e., additional payments] that have been negotiated for me." See *Whitman*, 293 Mich App at 225.

-1-

from WPA protections, because he did not act as a "whistleblower" under the meaning of the WPA. We dismissed his case on this narrow ground, and further held in a footnote that his alleged whistleblowing activity was not the cause of the mayor's refusal to grant him another four-year term as chief of police.[6]

The Michigan Supreme Court reversed, and "disavowed" what we thought was the principle articulated in *Shallal* on the dispositive nature of plaintiff's private motivations.[7] It remanded the case and instructed us to address "all remaining issues on which [we] did not formally rule, including whether the causation element of the [WPA] has been met."[8]

Because our narrow 2011 ruling regarding plaintiff's private motivation meant that we did not look at the larger—and, to our mind, more important—question of whether plaintiff's conduct objectively promoted the public interest, we addressed and decided this issue on remand in 2014.[9] We held that the purpose of the WPA is to advance the public interest, and thus the statute protects only those plaintiffs whose actions, irrespective of their personal motivations, objectively advance the public interest. And because plaintiff's conduct ran contrary to the public interest, rather than advancing the public interest, we held that plaintiff was not protected by the WPA.

We further held, once again, but with fuller explanation, that plaintiff's alleged whistleblowing activity was clearly not the reason the mayor refused to renew his four-year term as chief of police. Instead, the mayor's refusal to renew plaintiff's four-year political appointment was a direct result of plaintiff's misconduct during his previous term—misconduct which only came to the mayor's knowledge during his post-election review of his team of political appointees. It was this review, and the information it revealed, that motivated the mayor to refuse to reappoint plaintiff to another four-year term as chief of police.

The day after we issued our second decision on appeal, the Michigan Supreme Court issued *Wurtz v Beecher Metro Dist*,[10] which held that WPA protections do not apply to "job applicants and prospective employees."[11] Then, on November 19, 2014, the Michigan Supreme Court vacated our 2014 decision and asked us to review our ruling in light of *Wurtz*.[12] Upon review of *Wurtz*, we conclude that plaintiff's claim must also be dismissed under its holding and reasoning.

---

[6] *Whitman*, 293 Mich App at 232 n 1.

[7] *Whitman*, 493 Mich at 306.

[8] *Whitman*, 493 Mich at 321.

[9] See *Whitman v City of Burton (On Remand)*, 305 Mich App 16; 850 NW2d 621 (2014).

[10] 495 Mich 242; 848 NW2d 121 (2014).

[11] *Wurtz*, 495 Mich at 253.

[12] *Whitman v City of Burton*, 497 Mich 896; 855 NW2d 746 (2014).

Therefore, we now hold that plaintiff's claim must be dismissed for any one or combination of the following reasons: (1) *Wurtz* requires its dismissal; (2) objectively, plaintiff's conduct did not advance the public interest, but instead ran contrary to the public interest; and (3) the mayor's refusal to reappoint plaintiff, a political appointee, to another four-year term as police chief, was because of plaintiff's misconduct, not the whistleblowing activity that allegedly took place long before his four-year term as chief had ended.

## II.  STANDARD OF REVIEW

A trial court's ruling on a motion for JNOV is reviewed de novo on appeal.  *Garg v Macomb Co Community Mental Health Servs*, 472 Mich 263, 272; 696 NW2d 646 (2005). "When reviewing the denial of a motion for JNOV, the appellate court views the evidence and all legitimate inferences therefrom in the light most favorable to the nonmoving party to determine if a party was entitled to judgment as a matter of law."  *Genna v Jackson*, 286 Mich App 413, 417; 781 NW2d 124 (2009).

## III.  ANALYSIS

### A.  PLAINTIFF IS NOT ENTITLED TO WPA PROTECTION

#### 1.  DEFENDANTS' ALLEGED WPA VIOLATION OCCURRED AFTER THE CONCLUSION OF PLAINTIFF'S TENURE AS POLICE CHIEF

##### 1A.  LEGAL STANDARDS

MCL 15.362, the provision of the WPA under which plaintiff brought suit, states:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

In *Wurtz*, the Michigan Supreme Court clarified that these protections do not apply to "job applicants and prospective employees."[13]  This is because a job applicant or prospective employee cannot be "discharged, threatened, or discriminated against . . . regarding . . . compensation, terms, conditions, location, or privileges of employment"[14]—only a *current*

---

[13] *Wurtz*, 495 Mich at 253.

[14] *Wurtz*, 495 Mich at 251.

employee can suffer such mistreatment.[15]  In other words, an employee only receives WPA protections from an employer's actions that occurred *during the course of his employment*.[16]

Accordingly, when it adjudicates a claim under the WPA, *Wurtz* instructs a court to look to the plaintiff's employment status at the time the alleged WPA violations occurred.[17]  If the defendant committed the alleged WPA violations during the course of plaintiff's employment, plaintiff's claim may proceed.  If the defendant committed the alleged WPA violations when plaintiff was not employed by the defendant, or when plaintiff was a job applicant or prospective employee,[18] plaintiff's claim must fail.  Under *Wurtz*, this classification—employed vs not employed (be it as a job applicant, prospective employee, or former employee)—is the *only* classification a court may use to assess whether the WPA provides protection to the plaintiff.[19] For purposes of this determination, it is inconsequential whether the plaintiff was an at-will employee, contract employee, or just-cause employee—the plaintiff will only receive protection under the WPA if the alleged WPA violation occurred during the course of his employment.[20]

The Michigan Supreme Court applied these principles to Wurtz, a contract employee who worked for a local water and sewage district under a fixed term.[21]  After the termination of his contract term, Wurtz wished to continue in his position, but the district declined to renew his contract.[22]  Wurtz then sued the district, and alleged that it violated the WPA when it refused to

---

[15] *Wurtz*, 495 Mich at 253.

[16] *Wurtz*, 495 Mich at 252 ("as gleaned from the WPA's express language, the statute only applies to individuals who currently have the status of an 'employee' ").

[17] *Wurtz*, 495 Mich at 252.  See also *Id.*, n 16:

> We recognize that plaintiff was an employee at the time he engaged in protected activity.  Significantly, however, plaintiff makes no claim that his employment contract was in any way breached or that he was subject to a specific adverse employment action enumerated by the WPA during his contract term.  Rather, plaintiff maintains that because he engaged in protected activity during his contract term, he has a right under the WPA to the renewal of his contract.

[18] *Wurtz*, 495 Mich at 253.

[19] Of course, as the Michigan Supreme Court stated, at-will employees—like any other kind of employee—are protected under the WPA against WPA violations allegedly committed by their employer *during the course of their employment.*  See *Wurtz*, 495 Mich at 256.  However, at-will employees—like any other kind of employee—are not protected under the WPA against WPA violations allegedly committed by their employer *after they are no longer employed.*  See *Wurtz*, 495 Mich at 253.

[20] *Wurtz*, 495 Mich at 253.

[21] *Wurtz*, 495 Mich at 245.

[22] *Wurtz*, 495 Mich at 246–247.

renew his contract, because it supposedly did so in alleged retaliation for actions he took during his employment.[23]  The Michigan Supreme Court rejected Wurtz's claim, because the WPA violation he claimed the district committed—its decision to not renew his contract—occurred *after* the conclusion of his contract term, when Wurtz was a job applicant or prospective employee.[24]  Stated another way, because the WPA violation alleged by Wurtz did not take place during the course of his employment, Wurtz had no claim against the district under the WPA.[25]

In sum, *Wurtz* holds that when a plaintiff alleges that a defendant violated the WPA, a court must assess the claim by ascertaining whether the alleged WPA violation occurred *during the course of plaintiff's employment* with defendant.  If plaintiff was employed at the time of the alleged WPA violation, plaintiff's case may proceed.  If plaintiff was not employed at the time of the alleged WPA violation, or was a job applicant or prospective employee[26] at the time of the allged WPA violation, plaintiff's case must fail.  Plaintiff's classification while he was an employee—i.e., as contract, at-will, or just-cause—is irrelevant to the court's determination, which focuses on whether plaintiff, regardless of his classification, was employed by defendant at the time the alleged WPA violation occurred.

## 1B.  APPLICATION

The charter of the city of Burton provides that:

> The Mayor shall appoint all administrative officers of the city, except the City Attorney and City Auditor.  The Mayor's appointments shall be subject to approval by an affirmative vote of four or more members of the Council.  The Council shall act within thirty (30) days from the date of submission upon any appointments submitted by the Mayor for approval.  [Burton Charter § 4.5(g); see <http://www.mml.org/resources/information/charter/pdf/68.pdf> (accessed June 30, 2015).]

The chief of police is among the city's "administrative officers."  Burton Charter § 6.1(a).  Most administrative officers, including the chief of police,

> . . . shall be appointed by the Mayor subject to the approval of the Council, and shall serve at the pleasure of the Mayor for indefinte [sic] terms, except that the Mayor shall reaffirm or appoint those administrative officers and other appointive officers provided in this charter within thirty (30) days from his election, and give Council notice of same.  [Burton Charter § 6.2(b).]

---

[23] *Wurtz*, 495 Mich at 247.

[24] *Wurtz*, 495 Mich at 258–259.

[25] *Wurtz*, 495 Mich at 258–259.

[26] *Wurtz*, 495 Mich at 253.

Accordingly, for the chief of police to continue his employment after a mayoral election, he must be "reappointed" or "reaffirmed" to the position by the mayor, within 30 days of the mayor's election. This reappointment mechanism effectively means that a chief of police serves a four-year term, albeit "at the pleasure of the Mayor."[27]

Here, Whitman alleges that he engaged in protected activity under the WPA—his purported "whistleblowing" regarding the city's initial refusal to compensate him for unused sick leave—during the course of his four-year appointment as police chief. He says that the mayor "retaliated" against him for this "whistleblowing," in violation of the WPA, *when the mayor declined to reappoint him as police chief after the mayor's reelection in November 2007.*

Under the express holding of *Wurtz*, Whitman may not bring a claim under the WPA.[28] Like Wurtz, Whitman alleges that defendants violated the WPA *after* the conclusion of his employment—i.e., after the conclusion of his four-year appointment as police chief.[29] He *does not* claim that he was "subject to a specific adverse employment action enumerated by the WPA" *during the course of his employment*. *Wurtz*, 495 Mich at 252 n 16. As a candidate for reappointment to the office of police chief, Whitman was essentially a "job applicant." His suit is premised on an alleged WPA violation committed by defendants *after* the termination of his four-year term as police chief.

Accordingly, Whitman, as political appointee seeking reappointment, was not subject to the protections of the WPA at the time of the alleged WPA violation. His suit under the WPA thus has no merit. We therefore reverse the trial court's denial of defendants' request for JNOV.

## 2. PLAINTIFF DID NOT OBJECTIVELY ADVANCE THE PUBLIC INTEREST

Whitman is not entitled to protection under the WPA for an additional reason: his conduct, as an objective matter, did not advance the public interest.[30] Because the WPA protects

---

[27] Mayoral elections take place every four years. Burton Charter § 4.2(b).

[28] *Wurtz*, 495 Mich at 252.

[29] As discussed in n 19 supra, we note that had the mayor terminated Whitman for whistleblowing activity *during* the course of Whitman's four-year term as police chief, Whitman's WPA claim might be valid. The reason Whitman's claim is not valid is because he complains of a WPA violation allegedly committed by defendants *after* the conclusion of his four-year term.

[30] The Michigan Supreme Court did not address this aspect of the WPA in its 2013 opinion, nor did it do so in its 2014 order. Our understanding of the Supreme Court's statement that plaintiff "engaged in conduct protected under the WPA," *Whitman*, 493 Mich at 320, is that this protection is predicated on a narrow reading of the WPA: namely, one that only analyzes the relevancy of a plaintiff's personal motivations for "blowing the whistle." Our reversed 2011 opinion only addressed this discrete aspect of the WPA.

those who protect the public interest by blowing the whistle on illegality, and laws in general are an expression of public policy for the benefit of the public, there is typically no question that reporting a violation of law advances the public interest. But this is not always true, and is certainly not true here.

In this case, plaintiff's actions are unquestionably and objectively contrary to the public interest. That is, regardless of his personal motivation, his "whistleblowing" effort sought enforcement of a law that harmed, not advanced, the public interest.

The law in question, Burton ordinance 68-C, is not a law that protects the public interest, but rather an ordinance that reads much like a standard, garden-variety collective-bargaining provision for wages and benefits.[31] It is simply a recitation that sets forth the wages and benefits for administrative, non-unionized employees of the city of Burton. Normally, an employee must use sick days or vacation days, or lose them. But under some collective-bargaining agreements and employment policies, employees may "accumulate" these days and then get paid for all such days not used. This perk is generally found in collective-bargaining agreements for unionized employees. But here, this benefit—along with a statement of wages and matters like dental insurance—were codified in 68-C.

The waiver of the benefits contained in 68-C—which plaintiff characterizes as a "violation of law"—has its origins in a severe financial crisis that afflicted the city of Burton in the early 2000s.[32] During this time period, the city's department heads—who obviously benefited from 68-C—voted as a group, not only to take a wage freeze, but to forgo this perk to avoid harmful layoffs and reduced services to the public.[33] In other words, the administrative

Because we did not analyze the overarching issue in our 2011 opinion—namely, whether the WPA only protects conduct that *objectively* advances the public interest—the Supreme Court did not address this issue in its 2013 decision. Because the Supreme Court instructed us in its 2013 remand to consider "all remaining issues on which [we] did not formally rule," we discussed this aspect of the WPA in our vacated 2014 opinion, and do so again here. *Whitman*, 493 Mich at 321.

In any event, our Court has noted the distinction between an employee's personal motives in reporting legal violations, and whether that reporting actually advanced the public interest. See *Phinney v Perlmutter,* 222 Mich App 513, 554; 564 NW2d 532 (1997) ("[i]n addition, whether plaintiff sought personal gain in making her reports, rather than the public good, is legally irrelevant and need not be addressed *except to note that the reporting of misconduct in an agency receiving money is in the public interest*") (emphasis added). *Phinney*'s holdings on unrelated matters have likely been abrogated by *Garg*, 472 Mich at 290.

[31] See Burton Ordinances 68-25C, § 8(I) ("68-C"). As noted by the Supreme Court, Burton's ordinance numbering and policy regarding unused leave time have changed since the time of trial. *Whitman*, 493 Mich at 306, n 3. "Because those changes are not relevant to our analysis, this opinion refers to the ordinance numbering and language as it was introduced during trial." *Id*.

[32] *Whitman*, 293 Mich App at 224.

[33] *Whitman*, 493 Mich at 307.

team's waiver of the perks contained in the ordinance was an illustration of shared sacrifice by the non-unionized department heads, to advance the public interest of the citizens of Burton, at the employees' expense.

Only one department head objected to this public-spirited waiver of perks: plaintiff, the then–chief of police.[34] He demanded his money as set forth in the ordinance,[35] which he received after the mayor acted on the advice of outside legal counsel. This is the "law" plaintiff (mis)uses to assert a claim under the WPA.

We say misuses advisedly because the WPA is designed to ferret out violations of the law that injure the public, especially when applied to public-sector defendants.[36] If government officials, who are bound to serve the public, violate laws designed to protect the public from corruption, pollution and the like, then employees who, at their own risk, blow the whistle on such illegality necessarily serve the public interest—which is precisely why the WPA grants such employees protection from reprisal. Yet, where the law in question, as here, is not a law to protect the public, but rather a simple listing of wages, benefits, and various perks—and the very public servants who benefit financially from the ordinance make a personal sacrifice, and waive their right to these perks to save the public badly needed funds, and to prevent layoffs and reduced public services—then any action contrary to the waiver is contrary to the public interest. Again: the waiver of the perks set forth in the ordinance at issue advances the public interest. Opposition to that waiver—on which plaintiff bases his suit—objectively disserves the public interest.

Also, whistleblowing assumes that an employee takes a risk of retaliation for uncovering the public employer's misconduct. Here, there simply was no misconduct or illegality. The only conduct of the city employees that implicated 68-C was the department heads' decision to waive the ordinance, and plaintiff's refusal to honor that waiver. This is an insistence by an employee, plain and simple, to get his perks—not an uncovering of corruption or illegality. And this disagreement about the legal effects of the waiver was satisfied, in plaintiff's favor, after the city sought legal counsel. Accordingly, plaintiff's citation of the ordinance was not whistleblowing. It simply involved a disagreement regarding the proper interpretation of defendant's labor laws:

---

[34] *Whitman*, 493 Mich at 307. It appears that Whitman attended the March 2003 meeting when the department heads decided to waive 68-C, but it is unclear whether Whitman voiced an opinion on the waiver at the meeting.

[35] *Id*.

[36] "[The WPA encourages employees to assist in law enforcement] with an eye toward promoting public health and safety. *The underlying purpose of the [WPA] is the protection of the public*. The act meets this objective by protecting the whistleblowing employee and by removing barriers that may interdict employee efforts to report violations or suspected violations of the law. Without employees who are willing to risk adverse employment consequences as a result of whistleblowing activities, the public would remain unaware of large-scale and potentially dangerous abuses." *Dolan v Continental Airlines/Continental Express*, 454 Mich 373, 378–379; 563 NW2d 23 (1997) (emphasis added; footnotes omitted).

whether the administrative team could waive the perks under 68-C, and whether plaintiff was bound by the group's waiver. It has nothing to do with whistleblowing whatsoever.

This is why this is not the usual case, where a report of a violation of law normally constitutes conduct in the public interest.[37] Here, to the contrary, plaintiff's actions—as an objective matter—were undoubtedly against the public interest. And defendant did not actually "violate" any law in the sense that "violations of law" have been traditionally understood in whistleblowing lawsuits—i.e., revealing public corruption or malfeasance. It simply refused (at first) to grant plaintiff a monetary perk that he demanded, because all managerial employees waived these perks. Plaintiff may or may not have been entitled to his perks, but he most certainly is not entitled to claim the protection of the WPA, when his conduct objectively serves his interest, but harms the public's.

Because he is not a "whistleblower" under the WPA, no juror could legally find in favor of plaintiff on his WPA retaliation claim. The trial court's denial of defendant's request for JNOV is accordingly reversed.

## B. CAUSATION[38]

---

[37] Cases from our sister states interpreting their whistleblower statutes and jurisprudence recognize the distinction between reported legal violations that affect the public interest (which are protected) and reported legal violations that affect solely private interests (which are not). Though these cases involve internal corporate disputes—as opposed to reports of violated municipal statutes—we think that the reasoning is equally relevant to this case, where the violated statute did not advance the public interest. See *Garrity v Overland Sheepskin Co of Taos*, 917 P2d 1382, 1387 (NM, 1996) ("[w]hen an employee is discharged for whistleblowing, the employee must also demonstrate that his or her actions furthered the public interest rather than served primarily a private interest"); and *Darrow v Integris Health, Inc*, 176 P3d 1204, 1214 (Okla, 2008) ("to distinguish whistleblowing claims that would support a viable common-law tort claim from those that would not, the public policy breached must truly impact public rather than the employer's private or simply proprietary interests"). Cases from foreign jurisdictions are not binding, but can be persuasive authority. *People v Campbell*, 289 Mich App 533, 535; 798 NW2d 514 (2010).

[38] To prevail under the WPA, plaintiff must "establish a causal connection between [the] protected conduct and the adverse employment decision by demonstrating that his employer took adverse employment action *because of* his protected activity." *Whitman*, 493 Mich at 320 (emphasis original). In the absence of direct evidence of retaliation (which Whitman does not present), he must show indirect evidence to demonstrate "that a causal link exists between the whistleblowing act and the employer's adverse employment action." *Debano-Griffin v Lake Co*, 493 Mich 167, 176; 828 NW2d 634 (2013). A plaintiff's presentation of indirect evidence is analyzed under "the burden-shifting framework set forth in *McDonnell Douglas* [*v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973)]." *Id*. Applying this standard to retaliation claims, a plaintiff must show that his "protected activity" under the WPA was "one of the reasons *which made a difference* in determining whether or not to discharge the plaintiff." *Matras v Amoco Oil*

We also held in our 2011 opinion that plaintiff's alleged whistleblower activity from late 2003 to early 2004 was not the legal cause of the mayor's decision to not reappoint plaintiff as police chief in late 2007.[39]  Upon closer examination of the facts pertinent to the causation issue, we are more convinced that plaintiff's alleged whistleblower activity lacks a causal link to the mayor's decision.  We so hold for several reasons.

## 1. TRUST, NOT WHISTLEBLOWING

As noted, in 2003, the mayor's administrative team voted to voluntarily take a wage freeze and forego the perk of accumulated sick days to save taxpayer's money, and avoid layoffs and reduced services.[40]  This sacrifice spoke well of the mayor and his department heads. Plaintiff's refusal to abide by the department heads' agreement, and subject himself to the same sacrifice, raised issues of trust and caused the mayor to rightly be disappointed in plaintiff. Indeed, plaintiff's "evidence" of a causal connection between his "whistleblowing" and the mayor's decision to not reappoint him, many years later, frames the issue in exactly this context.

A third party who attended plaintiff's June 2004 meeting with the mayor made handwritten notes of the discussion, which state: "*Mayor* = No Trust—68-C (vacation)—lack of communication[.]"[41]  And the mayor's alleged December 2007 statement to other senior police officers that he and plaintiff "got off on the wrong foot"[42]—a statement that, if made, occurred *after* the mayor decided not to reappoint plaintiff[43]—supposedly emphasized plaintiff's 68-C complaints as an issue of trust, in that plaintiff's failure to adhere to a voluntary agreement with his colleagues betrayed that trust.  In sum, it appears the mayor viewed the 68-C issue not in the context of whistleblowing, or anger at plaintiff's supposed whistleblowing, but instead as an example of how plaintiff was untrustworthy.  As noted, this is not even a case where a "violation of law" was even remotely an issue.  And it is, at best, extremely unlikely that even this "lack of

---

*Co*, 424 Mich 675, 682; 385 NW2d 586 (1986) (emphasis added; citations omitted).  In other words, "[t]o establish causation, the plaintiff must show that his participation in a [protected activity] was a significant factor in the employer's adverse employment action, not just that there was a causal link between the two."  *Rymal v Baergen*, 262 Mich App 274, 303; 686 NW2d 241 (2004) (citations omitted).  Because *Debano-Griffin* uses the *McDonnell Douglas* framework, originally designed for employment discrimination claims, it is appropriate for the Court to use federal cases interpreting *McDonnell Douglas* as persuasive authority.  See *Radtke v Everett*, 442 Mich 368, 382; 501 NW2d 155 (1993) (stating that Michigan courts "turn to federal precedent for guidance in reaching [their] decision" on whether plaintiff has established a valid discrimination claim).

[39] *Whitman*, 293 Mich App at 232, n 1.

[40] *Whitman*, 293 Mich App at 230.

[41] *Whitman*, 303 Mich at 309 (emphasis original).

[42] *Id*.

[43] It is difficult to see how a statement the mayor allegedly made *after* he had already declined to reappoint Whitman would influence his decision not to reappoint Whitman.

-10-

trust" over plaintiff's failure to honor an agreement on this specific occasion had anything to do with his subsequent dismissal, for the numerous reasons discussed below.

## 2. ALLEGED RETALIATION IS TEMPORALLY REMOTE FROM ALLEGED WHISTLEBLOWING

Plaintiff's claim has a serious temporal problem: he alleges that he was not reappointed in late 2007 for events that took place in late 2003 and early 2004. Our courts have taken pains to stress that the length of time between an alleged whistleblowing and an adverse employment action are not dispositive of retaliation—when those two events are *close in time* (i.e., days, weeks, or a few months apart).[44] If whistleblowing and retaliation that occur close in time are not sufficient to find causation under the WPA, whistleblowing and retaliation that occur *far apart* in time are certainly not sufficient to support causation—and, in fact, weigh against finding causation. See *Fuhr v Hazel Park Sch Dist*, 710 F3d 668, 675 (CA 6, 2013) (holding in the context of a Title VII retaliation claim that a two-year gap between plaintiff's protected activity and the claimed retaliatory act "proves fatal to [plaintiff's] assertion that there is a causal connection").[45]

Here, there is an enormous temporal gap between plaintiff's alleged whistleblowing and the supposed retaliation, which belies any causal connection between the two. As noted, plaintiff's demands to receive compensation under 68-C took place in 2003 and early 2004. The mayor declined to reappoint him police chief in November 2007—almost four years after the supposed whistleblowing. Of course, the mayor, as the top executive officer of the city of

---

[44] See, for example, *West v Gen Motors Corp*, 469 Mich 177, 186; 665 NW2d 468 (2003) (to satisfy causation requirement under WPA, plaintiff must show "something more than merely a coincidence in time between protected activity and adverse employment action"); *Tuttle v Metro Govt of Nashville*, 474 F3d 307, 321 (CA 6, 2007) ("[t]he law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim"); and *Shaw v Ecorse*, 283 Mich App 1, 15; 770 NW2d 31 (2009) ("[a] temporal connection between protected activity and an adverse employment action does not, in and of itself, establish a casual connection").

[45] In its opinion, the Sixth Circuit noted that "[o]ur review of the law shows that multiyear gaps between the protected conduct and the first retaliatory act have been insufficient to establish the requisite causal connection." *Fuhr*, 710 F3d at 676. This observation is correct; interpretations of our sister states' whistleblower laws and jurisprudence have made similar observations on how a long time span between the alleged whistleblowing and supposed retaliation weigh against finding causation. See *Blake v United American Ins Co*, 37 F Supp 2d 997, 1002 (SD Ohio, 1998) (holding that alleged whistleblowing action that took place five years before plaintiff's termination was not "close enough in time . . . to support a claim of retaliation"); *Anderson v Meyer Broadcasting Co*, 630 NW2d 46, 55 (ND, 2001) (holding that a "lengthy" delay of approximately a year "between [plaintiff's] reports and her termination does not support an inference she was fired because of the protected activity").

Burton, *could terminate plaintiff at any time*.[46] He could have done so in March 2003, when plaintiff first voiced opposition to the waiver of 68-C, or in early 2004, when plaintiff insisted on his compensation pursuant to the ordinance. In fact, the evidence demonstrates the mayor was not concerned about plaintiff's 68-C demands at all: he reappointed plaintiff as police chief in November 2003—six months after Whitman's initial complaint regarding 68-C. And, again, the expiration of plaintiff's term took place in November 2007, almost *four years* after those complaints.

It strains credulity to the breaking point to suggest, as plaintiff does, that the mayor—who had the power to dismiss plaintiff at any time, for any reason or no reason—was so upset with plaintiff's alleged "whistleblowing" in late 2003 and early 2004 that he allowed plaintiff to continue as police chief for all of 2004, 2005, 2006 and into late 2007, and only then decide to "retaliate" against plaintiff. Indeed, when viewed in the context of the typically close working relationship between a mayor and his chief of police, and the fact that the chief of police, as a member of the mayor's executive team, serves at the *pleasure of the mayor*, plaintiff's allegations take leave of reality and enter the theatre of the absurd.

### 3. BREAKS IN PLAINTIFF'S SUPPOSED CAUSAL CHAIN

The long period of time between plaintiff's supposed whistleblowing and the mayor's decision not to reappoint him involves another aspect that is fatal to plaintiff's claim: numerous breaks in the causal chain. Plaintiff's first complaints regarding the administrative team's waiver of 68-C in March 2003 clearly did not cause the mayor to retaliate. Indeed, the mayor reappointed him chief in November of that same year. His further attempts to secure compensation in January 2004 were addressed by the mayor—who sought the advice of city counsel and then outside labor counsel—and complied with that legal advice by paying him almost $7,000 in additional compensation. And his 2004 dispute with the mayor ended amicably—he remained chief for over three years following that meeting, and, by his own admission, plaintiff never heard mention of the 68-C dispute from the mayor and never was retaliated against during that time period. These intervening events—all positive developments for Whitman—raise serious doubts that his 68-C whistleblowing was a "determining factor" or "caus[e] in fact" of the mayor's decision to not reappoint him. *Matras*, 424 Mich at 682.

### 4. PLAINTIFF'S MISCONDUCT LED TO ADVERSE EMPLOYMENT ACTION

In any event, plaintiff has provided no evidence to refute the mayor's stated and compelling reasons for not reappointing him: plaintiff engaged in serious misconduct and misused his office. After his reelection in November 2007, the mayor reevaluated his entire administrative team pursuant to the mandates of Burton Charter § 6.2(b).[47] During this period,

---

[46] Again, Burton Charter § 6.2(b) states that the chief of police serves "at the pleasure of the mayor.

[47] Again, Burton Charter § 6.2(b) states:

he was advised of plaintiff's serious misconduct in office by officers in plaintiff's department. Among other things, these included allegations that Whitman: (1) meted out inadequate discipline of subordinates who abused their power; (2) misused a city computer to exchange sexually explicit email messages with a woman who is not his wife; (3) discriminated against a female officer; and (4) forged a signature on a budget memo.[48] Command officers within the police department warned the mayor of serious morale problems created by plaintiff's abuse of power.[49] In the face of these troubling revelations, the mayor understandably did not reappoint plaintiff to this important position of public trust—and these are the reasons the mayor gave for declining to reappoint plaintiff as police chief in November 2007. To suggest that a mayor, whose chief works at his pleasure, would make a reappointment decision due to an old, stale issue instead of very recent, more disturbing revelations, is simply fanciful.

Plaintiff made no specific effort before this Court to deny these allegations against him, other than to state, self-servingly and without support, that they are "merely a pretext," and to assert "that his personnel file demonstrates that his performance as police chief was good, that he had received numerous awards, and that there were never any disciplinary actions against him." *Whitman*, 493 Mich at 309–310. His only proffered "evidence" of a causal connection between his supposed "whistleblowing" and the mayor's decision to not reappoint him is the aforementioned statement made by the mayor in December 2007—after the mayor already made his decision, but before its public announcement—in which the mayor supposedly told senior police officers that he lacked trust in plaintiff. He cited as one example plaintiff's refusal to keep his word, and, along with the entire administrative team, waive his unused sick-day compensation under 68-C.

When this assertion is weighed against the other factors in this case—(1) the mayor's view of plaintiff's 68-C demands as a trust, not retaliation, (and certainly not "whistleblowing") issue; (2) the almost four-year interval between plaintiff's alleged whistleblowing and the purported retaliation; (3) the causal breaks in plaintiff's claim; and (4) allegations of plaintiff's extensive misconduct—the evidence is overwhelming that plaintiff's so-called "whistleblowing" had no connection to the mayor's decision to not reappoint him as police chief. There is simply no way that a reasonable factfinder, even when "view[ing] the evidence and all legitimate inferences . . . in the light most favorable to the nonmoving party," could find that retaliation was "one of the reasons *which made a difference* in determining whether or not to discharge the plaintiff." *Matras*, 424 Mich at 682 (emphasis added).

> All other administrative officers shall be appointed by the Mayor subject to the approval of the Council, and shall serve at the pleasure of the Mayor for indefinite [sic] terms, except that the Mayor shall reaffirm or appoint those administrative officers and other appointive officers provided in this charter within thirty (30) days from his election, and give Council notice of same.

[48] See *Whitman*, 493 Mich at 309. Whitman admitted at trial that he used a city computer to exchange sexually explicit messages with a woman who is not his wife. Plaintiff makes no specific effort to deny these other allegations, but states that they are "merely a pretext." *Id*. at 310.

[49] *Whitman*, 293 Mich App at 227.

## IV. REPLY TO THE DISSENT

The dissent's analysis betrays a basic misunderstanding of the nature and function of executive appointments in governmental administration. Again, the mayor of Burton is required by the city charter to "reaffirm or appoint" "administrative officers" to the city administration "within thirty (30) days from his election." Burton Charter § 6.2(b). The city council is then required to confirm or deny the appointment "within thirty (30) days from the date of submission." Burton Charter § 4.5(g). Because the mayor is elected every four years, he is required, by the city charter, to "reaffirm or appoint" the city's "administrative officers" every four years. Within that four year span, the mayor may dismiss an administrative officer at any time. Burton Charter § 6.2(b).

As such, an administrative officer in the city of Burton has no expectation of continued employment. He knows that his term cannot last longer than four years, because, after the mayor's election or reelection, he must be "reaffirmed" to his position. And he also knows that his term may be *much shorter* than four years—indeed, it may be ended at any time—because he serves "at the pleasure of the mayor."

Here, as we explain in our opinion, *Wurtz* mandates that Whitman's suit be dismissed. The mayor was reelected in November 2007. Upon the mayor's reelection, Whitman's term as police chief, which began in 2003, effectively ended, because the city charter required the mayor to "reaffirm or appoint" a police chief, and submit his suggestion to the city council for approval. Thus, at this stage, Whitman was a *candidate* for the position of police chief, because his term as the chief of police ended with the mayor's reelection. Accordingly, Whitman cannot now use the WPA—which does not protect "job applicants" or "prospective employees"—to sue the city for the mayor's ultimate decision to not reappoint him as police chief. In other words, Whitman may not bring a WPA claim against the city of Burton for the mayor's decision to not reappoint him to an office that, as a matter of law, he no longer held at the time of his non-reappointment.

The dissent attempts to escape this obvious outcome with irrelevant appeals to emotion ("[Whitman] was a full-time, 32 ½-year employee with the City of Burton"), misstatements of fact ("Smiley removed [Whitman] on November 27, 2007"), and basic misinterpretations of key terms ("[Whitman] enjoyed an 'indefinite' term of employment [as chief of police]").

The last of these is particularly egregious. The true, non-colloquial, definition of "indefinite" is "not definite"—i.e., "having no exact limits." *Merriam Webster's Collegiate Dictionary* (2014). This is exactly the way in which the term is used in Burton's city charter:

> All other administrative officers shall be appointed by the Mayor subject to the approval of the Council, and *shall serve at the pleasure of the Mayor for indefinite [sic] terms*, except that the Mayor shall reaffirm or appoint those administrative officers and other appointive officers provided in this charter within thirty (30) days from his election, and give Council notice of same. [Burton Charter § 6.2(b) (emphasis added).]

Instead of using the correct definition of "indefinite" supplied by a dictionary and in keeping with the broader context of the sentence in which it is used in Burton's charter, the

dissent interprets "indefinite" to mean "forever"—i.e., that Whitman had an expectation of continued employment for an unlimited period of time.

This interpretation is the *exact opposite* of what the term "indefinite" actually means in the context of the city charter. Again, an "indefinite" term is one that is "not definite"—i.e., *one that can end at any time*—today, tomorrow, or any time before the conclusion of the four-year term. Accordingly, the city charter's use of "indefinite" means that while a police chief may be employed for a full four-year term, he serves "at the pleasure of the mayor," and may be terminated *at any time* within that four-year span *before* the expiration of his term. Therefore, Whitman had no expectation of continued employment. But, most importantly, for the application of *Wurtz*, the law of the city of Burton required plaintiff to be reappointed (and approved by the city council) as the chief of police *every four years*, after the mayor's reelection. As the mayor chose not to reappoint him as police chief *after* his term as police chief had expired, Whitman has no recourse under the WPA.

Finally, the dissent attempts to confuse matters by insinuating that we do not recognize that at-will employees are protected under the WPA. Of course, we recognize the obvious proposition that an at-will employee, like any other employee, is protected under the WPA—*for retaliatory actions taken against him when he is employed*. Here, defendants never took a retaliatory action against Whitman while he was employed as chief of police. Rather, the mayor chose to not reappoint Whitman *after* his reelection in November 2007, at which time Whitman became a candidate for the (now open) position of police chief.

## V. CONCLUSION

We hold that plaintiff's claim must be dismissed for any one or combination of the following reasons: (1) *Wurtz* requires its dismissal; (2) objectively, plaintiff's conduct did not advance the public interest, but instead ran contrary to the public interest; and (3) the mayor's refusal to reappoint plaintiff, a political appointee, to another four-year term as police chief, was because of plaintiff's egregious misconduct, not the whistleblowing activity that allegedly took place long before his four-year term as chief had ended.

Accordingly, because no reasonable factfinder could legally find in favor of plaintiff on his claim under the WPA, we reverse the trial court's denial of defendants' motion for JNOV, and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.


/s/ Henry William Saad
/s/ Peter D. O'Connell