*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ERIC DALE,

UNPUBLISHED
September 5, 2024

        Plaintiff-Appellant/Cross-Appellee,

v

No. 364971
Calhoun Circuit Court
LC No. 2021-000571-CZ

MARSHALL TOWNSHIP,

        Defendant-Appellee/Cross-Appellant.

Before: GARRETT, P.J., and LETICA and MALDONADO, JJ.

PER CURIAM.

        Plaintiff-appellant/cross-appellee, Eric Dale, filed this action against defendant-appellee/cross-appellant, Marshall Township, and claimed that the township terminated his employment in violation of The Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq*. Dale served as a firefighter for the township for nearly 20 years, and also served as an assistant fire chief, when the township fire board voted to terminate Dale's employment based on the recommendation of township fire chief, Steven Riggs. In the weeks and months before his termination, Dale reported various concerns to township leaders about problems within the fire department, the most serious of which involved the legitimacy of certain payments Chief Riggs made to his sons, who also worked for the fire department. Because we hold that Dale established a genuine issue of material fact that he was both engaged in a protected activity and that Marshall Township terminated him because of that activity, we reverse the trial court's grant of summary disposition to the township under MCR 2.116(C)(10). We disagree with Marshall Township's contention on cross-appeal that the statute of limitations barred Dale's complaint, and we also disagree with Dale's request that the case be remanded to a different judge in a different circuit court. For these reasons, we affirm in part, reverse in part, and remand to the same court for further proceedings.

## I.  FACTUAL AND PROCEDURAL HISTORY

### A.  DALE'S POSITION AND CONCERNS

The Marshall Township Fire Department hired Dale as a firefighter in 2001.  Chief Riggs served as the fire chief and, in 2015 or 2016, Chief Riggs appointed his son Jay Riggs and Dale to share the job of assistant fire chief.  Chief Riggs's other son, Josh Riggs, also worked as a firefighter for the township's fire department.  In 2019, Jay accepted a job as a full-time firefighter for the city of Marshall while he continued to serve as an officer for the township fire department.  The township had a mutual aid agreement with the city of Marshall and other municipalities in Calhoun County.  The agreement allowed fire departments to respond to and assist with incident calls in other jurisdictions.  According to Dale, although no written policy prohibited it, there was a long-standing rule that township fire department officers could not also work for fire departments with which the township had mutual aid agreements.

After Jay began working for the city fire department, Dale expressed concerns about a violation of the dual employment rule to Chief Riggs and members of the fire and township boards.  Dale also expressed concerns that Jay received compensation from both the city and township when he responded to incident calls under the mutual aid agreement.  According to Dale, when Jay would arrive at a mutual aid incident as a city firefighter, he would instruct someone from the township fire department to also put his name down on the township run sheet so that he would get paid by both the city and township for working the same incident.  Dale also asserted that the township paid Jay to participate in township fire department training while Jay was on duty at the city's fire department.

From Dale's perspective, Jay's positions as an officer of the township fire department and a city firefighter also caused safety concerns and confusion at fire scenes.  Dale testified that, when Jay responded to a fire as a member of the city's fire department in June 2020, he directed a township firefighter to use a city-owned self-contained breathing apparatus in an active structure fire even though the township firefighter had no training on how to use it.  Dale asserted that, at another incident in August 2020, Chief Riggs turned over control of a scene to Jay because Chief Riggs could not hear radio traffic, even though Jay had responded to the call as a non-officer, city firefighter.  According to Dale, because he was an assistant fire chief, firefighters expressed frustration to him about Jay assuming this authority, and he further noted that, despite safety concerns about Chief Riggs's hearing problems, the chief did not receive annual hearing tests required for firefighters.  Dale believed for a time that this violated the National Fire Protection Association standards adopted in the Michigan Administrative Code.

Dale also observed that Chief Riggs paid his sons to do administrative tasks that the township paid Chief Riggs to perform and that he did not pay other firefighters for doing work in addition to their fire runs and training hours.  Dale testified that Chief Riggs also paid one or both of his sons for training and fire runs that never occurred or in which they did not participate as township firefighters.  In Dale's opinion, it violated the law for Jay to receive double pay and for Chief Riggs to pay Jay and Josh additional compensation from the fire department.

Dale spoke to Chief Riggs about Jay working as a township fire department officer while also working as a full-time firefighter for the city.  Dale testified that Chief Riggs said he would

speak to the fire board about it, but Dale did not think he did so.  Dale also aired his concerns to township board member Ronald Quinn, fire board members Paul Kiessling and Jefferey Albaugh, and township supervisor David Bosserd.  Quinn discussed Dale's concerns with Albaugh and Bosserd.  Quinn told Dale that he believed the fire board should hear Dale's concerns.

At a fire department officers meeting in February 2020, Dale and Lieutenant William Cohoe expressed concerns to Chief Riggs about training opportunities, inappropriate language in front of female firefighters, failure to hold annual meetings and reviews, and a lack of transparency about department expenditures and payroll.  According to Dale, Chief Riggs declined to address the issues.

## B.  FIRE DEPARTMENT MEETING AND DISCUSSIONS WITH TOWNSHIP OFFICIALS

At a fire department meeting on September 24, 2020, Chief Riggs announced that a fire chief from another fire department called him and said that a Marshall Township firefighter made negative comments about the other fire department.  During discovery, an audio recording of the meeting was produced and transcribed.  As Chief Riggs explained at the meeting:

> [The other fire chief] didn't know who.  I don't know who . . . half our department is here, it might be one of the people who are not here but, we're all in this together, every department is doing the best that they can do.  That kind of behavior is not going to be tolerated by me.  If I get another call or get a name . . . [.]  If anyone has an issue with any other department, come see me and me alone and tell me and I will handle it.  But if I hear any more shit going on and I find who it is, they will not be on this department.

Dale asked Chief Riggs if the complaint came from Marengo or Fredonia, which are townships.  Chief Riggs declined to name the department and said that it did not matter.  Dale responded that it did matter and that he knew that Marengo's fire department was unhappy because Chief Riggs made a comment to Marengo firefighters at a semi-truck fire.  Chief Riggs asked Dale why he did not tell him about it and Dale replied that Marengo's fire chief was going to call Chief Riggs to discuss it.  Dale explained that he told the person who reported the problem that he should talk to the chief about it, as Chief Riggs wanted, but wondered if this incident was the one Chief Riggs was talking about.  The following exchange then occurred between Chief Riggs and Dale:

> [*Chief Riggs*]:  Well if it wasn't—I'm not even going to tell what department, but it wasn't Marengo, I'll tell you that much.  But anyway—if anybody's got issues with other departments, come to me and I will talk to the department and try to get it straightened out.  Does everybody understand that?  That's all I have.  I think we're all set.  I will see you[.]

> \* \* \*

> [*Chief Riggs*]:  Well that is all I got right there.  They didn't give me names or anything so I don't—I don't know who it was.  Like I said, there's eight not here tonight, it could've been somebody else.  He didn't elaborate on names, he just said a firefighter from your department.  That's all.  I didn't ask and he didn't say.

[*Dale*]: Just to know, anybody that throws that out there should at least say who it is or what the deal is. No offense, but it's kinds of chicken shit if someone says it but doesn't bring that—

[*Chief Riggs*]: I told you what I know[.]

[*Dale*]: Right.

[*Chief Riggs*]: So, if anybody hears anything, I mean, come to me. You know? Let me know. If I make a mistake, I'll get with the other department and apologize and clarify but if anybody's got an issue with another department, come talk to me and tell me you have an issue with them and as Chief, I will talk to their Chief and tell them what's going on and tell them what we would like, you know, get it resolved. It's not just behind everybody's back and let me know that's not the way to handle it. We're done.

From a recording, it is apparent that Dale was describing as "chicken shit" the other fire chief complaining to Chief Riggs about an unnamed township firefighter and that Chief Riggs responded as though he understood Dale's meaning.

Dale again talked to township board member Quinn on or about September 29, 2020 and discussed the misappropriation of fire department funds through payments authorized by Chief Riggs to his sons, harassment of female firefighters, conflict of interest and double payment concerns about Jay's employment with the city and township, and safety concerns about Chief Riggs's hearing problems. Quinn told Dale to discuss the issues with Bosserd and Dale testified that he did so on September 30, 2020.

On October 7, 2020, Chief Riggs called Dale and left a message that he wanted to meet, but Dale was at a cross-country meet with his child. Dale replied to Chief Riggs that he was out of town, but could meet later in the week. Dale testified that, the next day, he went to a monthly fire department training and Chief Riggs approached him and demanded that he immediately go to the other fire station to meet with him in private. Dale testified that he told Chief Riggs that he would only meet if another firefighter or board member could be there. According to Dale, Chief Riggs refused his request and walked away. Chief Riggs recalled this interaction with Dale differently. Chief Riggs testified that he asked Dale to meet with him and Dale refused, even though Chief Riggs offered to have a third person join them at the meeting.

Chief Riggs testified that, on or about October 8, 2020, he printed a letter and disciplinary warning about Dale. The letter stated that Dale showed disrespect and a lack of professionalism at the fire department meeting on September 24, 2020. The letter also stated that Dale made an unfounded accusation about Chief Riggs regarding the fire call with Marengo Township that Chief Riggs found to be false. The disciplinary warning included the same assertions, and further stated that Dale refused to meet with Chief Riggs about the matter, which Chief Riggs described as insubordination. The letter included a line for Dale's signature, but Chief Riggs testified that Dale never signed the document because he refused to meet with Chief Riggs. Chief Riggs acknowledged that he never gave the documents to Dale and he did not send them to Dale through mail or e-mail, although he could have done so.

On October 9, 2020, Chief Riggs called Dale, but Dale was again out of town at another cross-country meet with his child. At 5:52 p.m., Chief Riggs sent the following text message to Dale:

> Eric for our conversation last night when you decided you would not meet with me concerning the accusations towards me I have no choice but to terminate your employment with the Marshall Township Fire Department I would like your pager and radio on my desk at station 2 by noon Saturday if you would like to appeal my decision you can contact Paul [Kiessling] at [Kiessling's phone number] head of the fire board. [Punctuation in original.]

Dale forwarded the text message to Bosserd and Quinn, and Bosserd told Dale to gather some other firefighters and meet with him. On October 13, 2020, Dale, Cohoe, and firefighter J.D. Stealy met with Bosserd and Albaugh on Bosserd's property. The three firefighters expressed their concerns about misappropriation of township funds, Chief Riggs's hearing, and inappropriate language around or toward women in the fire department.

## C. TOWNSHIP ATTORNEY INVESTIGATION AND FIRE BOARD VOTE

On October 19, 2020, the fire board held a meeting and acknowledged that Chief Riggs changed his recommendation regarding Dale from termination to paid administrative leave. The fire board concurred with the recommendation and resolved to engage township attorney Seth Koches to review the facts and circumstances that prompted Chief Riggs to recommend a personnel action against Dale. At a fire board meeting on December 17, 2020, Koches reported that he spoke to Chief Riggs, Dale, and two unnamed firefighters during his investigation. Koches stated that Chief Riggs did not have the authority to terminate Dale, and could only recommend Dale's termination to the fire board for it to either affirm or deny.

Koches reported to the fire board that, when he interviewed Chief Riggs for his investigation, Chief Riggs gave him a grievance document in which he set forth his complaints about Dale. In the grievance document, Chief Riggs stated that procedure dictated that firefighters should first address concerns with the fire chief and, if not satisfied, they could bring the grievance to the fire board and then to the township board. Chief Riggs wrote that he expected firefighters in his department to be loyal to one another, to respect his authority, and to follow proper procedures. According to Chief Riggs, Dale showed a lack of respect for his authority and questioned his integrity, which undermined the safety and well-being of the fire department. Chief Riggs further asserted that Dale "continues to undermine the policies put in place by the township board by circumventing the fire board and fire chief and going directly to a Township Board member."

Chief Riggs also stated in the grievance document that, in September 2019, when Jay began working as a city firefighter, "Dale immediately began questioning if firefighter [Jay] Riggs should remain as Assistant Chief on the township department." Chief Riggs stated that Dale did not talk to him about his concerns, and that Chief Riggs only found out about Dale's claims when he heard that Dale complained to, among others, a township board member. Chief Riggs stated that he informed Dale that Jay's positions with both fire departments did not violate any bylaws.

However, Chief Riggs maintained that Dale "continues to insinuate that there are problems within the department but does not identify them specifically or bring them forward for discussion."

Chief Riggs further asserted in the grievance document details about the fire department meeting on September 24, 2020. When he drafted the grievance document, Chief Riggs was apparently unaware that a recording of the meeting existed. Chief Riggs wrote in the grievance document that Dale made false accusations about another fire department. Chief Riggs stated that he raised the issue at the fire department meeting on September 24, 2020 to make clear that he would not tolerate firefighters making negative comments about other fire departments and that any issues should be brought to him as chief. Chief Riggs stated that Dale became "belligerent and confrontational" when he declined to name which fire chief made the complaint and Dale also called it "chicken shit." According to Chief Riggs, Dale then accused Chief Riggs of making statements that upset the Marengo Township fire department. When Chief Riggs asked why Dale did not tell him about this, Chief Riggs recalled that Dale refused to answer and stated " 'figure it out, you're the chief.' " Chief Riggs further asserted that Dale refused to meet with him to discuss these issues and that this "constitutes insubordination and creates unnecessary tension within the department." [1]

Chief Riggs's grievance document conflicted with statements he made at the fire department meeting on September 24, 2020 which, as noted, became clear when a recording of the meeting was located during discovery in this case. As discussed, Chief Riggs announced at the meeting that a fire chief told him that a township firefighter made negative comments about his fire department. Chief Riggs said at the meeting that the fire chief who made the complaint was not from Marengo Township, and Chief Riggs further stated that he was not told who made the negative comments. Dale noted the problem with Marengo, but when Chief Riggs asked why Dale did not tell him about it, Dale did not say "you're the chief, you figure it out," but instead said he told the firefighter to discuss the issue with the chief and the Marengo chief was going to contact Chief Riggs about it.

Contrary to what he said at the fire department meeting, Chief Riggs told Koches that it was Dale who made negative comments about Marengo's fire department. Chief Riggs told Koches that he talked to Marengo's fire chief and he denied knowing about any incident, and he decided not to talk to Marengo firefighters who may have been involved. Regardless, Chief Riggs told Koches that he believed Dale should be terminated because he refused to meet with Chief Riggs about the issue and this amounted to insubordination.

Dale testified that, when Koches interviewed him, he explained all the concerns he previously reported to Chief Riggs, township and fire board members, and the township supervisor. Koches told the fire board that Dale said he brought numerous issues to Chief Riggs's attention, but they were never resolved. Dale denied making any comments to Marengo firefighters, but stated that Chief Riggs told Marengo firefighters to clean up the scene of an

---

[1] Chief Riggs also noted that, on October 6, 2020, he "was made aware of an allegation of sexual harassment against a female firefighter and was accused of not acting on the allegation." After talking to female firefighters, Chief Riggs concluded that there was no merit to the sexual harassment allegation. It is unclear from Chief Riggs's assertion how this issue involved Dale.

-6-

incident in August 2020, which caused them to complain to Dale. As he stated at the fire department meeting, Dale told the firefighters to take their complaints to the fire chiefs.

Koches also reported to the fire board that he interviewed two unnamed firefighters who stated that Jay's appointment to be assistant chief was "problematic" and that firefighters thought that Chief Riggs only appointed Dale as assistant fire chief to "soften the blow" because Chief Riggs wanted Jay to be assistant fire chief.[2] Koches stated that firefighters were concerned that the fire department depended too much on the Riggs family, and that Jay unfairly received education and training opportunities that no one else received. The firefighters confirmed Dale's assertions that, before Jay began working for the city fire department, there was a policy that a city firefighter should not also serve as an officer for the township fire department. The firefighters also confirmed to Koches that Chief Riggs made a remark that upset Marengo firefighters and "there was concern that Marengo Township may not call the Marshall Township Fire Department for future assistance."

After Koches finished his presentation to the fire board about his investigation, Albaugh moved to affirm Chief Riggs's recommendation to terminate Dale and the board voted to do so. Dale received a letter from the township confirming his termination from the fire department dated December 20, 2020. Thereafter, Dale filed his complaint in this case, alleging that his termination violated the WPA. After conducting discovery, the parties filed cross-motions for summary disposition. The trial court granted the township's motion after concluding that Dale failed to establish a prima facie case under the WPA. This appeal followed.

II. ANALYSIS

A. STANDARD OF REVIEW

We review a trial court's ruling on a motion for summary disposition de novo. *Auto Club Group Ins Co v Burchell*, 249 Mich App 468, 479; 642 NW2d 406 (2001). When reviewing a motion brought pursuant to MCR 2.116(C)(10), we "must consider the pleadings, affidavits, depositions, admissions, and any other documentary evidence in favor of the party opposing the motion." *Baker v Arbor Drugs, Inc*, 215 Mich App 198, 202; 544 NW2d 727 (1996). Our "task is to review the record evidence, and all reasonable inferences drawn from it, and decide whether a genuine issue regarding any material fact exists to warrant a trial." *Id*. A genuine issue of material fact exists when the record, "giving the benefit of reasonable doubt to the opposing party, would leave open an issue upon which reasonable minds might differ." *Shallal v Catholic Social Servs of Wayne Co*, 455 Mich 604, 609; 566 NW2d 571 (1997).

---

[2] Jay later took over as fire chief of the township fire department after Chief Riggs retired.

## B. PRIMA FACIE CLAIM UNDER THE WPA

Dale argues that the trial court erred by granting summary disposition in favor of the township because there remain genuine issues of material fact that he engaged in protected activity and that his protected activity caused his termination. We agree.

This case involves claims that Dale was improperly discharged in violation of the WPA, MCL 15.362, which states:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

This Court explained that the "WPA is a remedial statute and must be liberally construed in favor of the persons it was intended to benefit." *Henry v Detroit*, 234 Mich App 405, 409; 594 NW2d 107 (1999). The purpose of the act is to protect the public. *Id*. "The act meets this objective by protecting the whistleblowing employee and by removing barriers that may interdict employee efforts to report violations or suspected violations of the law." *Id*. (quotation marks and citation omitted). "Without employees who are willing to risk adverse employment consequences as a result of whistleblowing activities, the public would remain unaware of large-scale and potentially dangerous abuses." *Id*. (quotation marks and citation omitted).

"To establish a prima facie violation of the WPA, a plaintiff must show (1) that the plaintiff was engaged in a protected activity as defined by the WPA, (2) that the plaintiff was discharged, and (3) a causal connection existed between the protected activity and the discharge." *Id*. This Court has identified two types of "whistleblowers." *Id*. A "Type 1" whistleblower includes "those who report, or are about to report, violation of law, regulation, or rule to a public body . . . ." *Id*.

In this case, it is undisputed that Dale was terminated from his position as assistant fire chief at the township fire department. To survive the township's motion for summary disposition, Dale needed to show that he engaged in protected activity and that the activity was causally connected to his termination. See *Shallal*, 455 Mich at 610.

When it granted summary disposition to Marshall Township, the trial court explained its reasoning as follows:

> There's nothing here in the facts presented here to indicate that [Dale] was in any way fired because of some type of information he was giving, or the fire chief or the fire board was in any way acting in a way to fire him because he was blowing a whistle or providing some type of information to the board. And honestly, I don't believe there's any truth to what he was—he's alleging as far as this basis either

-8-

from what I read in the information that I've been provided. There's nothing that verifies any of this. It's unfortunate.

Based upon all the information that I've received, the arguments here today, there's no misappropriate [sic] of funds that I can see. There was no threat to be terminated because he was going to blow a whistle, so to speak, he's not protected in any way, and the defense motion for summary disposition in this matter is granted.

We hold that the trial court erred in its interpretation and application of the WPA. Contrary to the trial court's stated reasoning, the evidence presented showed that Dale reported a suspected violation of law to a public body. Deposition testimony established that Dale raised concerns related to the township fire department to township board members as well as one or more fire board members and the township supervisor, all of whom fall within the definition of a public body for purposes of the WPA. See MCL 15.361(d)(*iii*). Dale reported that he suspected Chief Riggs of misappropriating township funds by paying Jay for attending fire runs when he was already paid by the city for the same work, paying Josh for completing administrative tasks like payroll when Chief Riggs received a salary for doing those tasks, and paying his sons for training or fire runs that did not occur.

It is undisputed that Dale raised these concerns to a township board member, Quinn, and that Dale spoke to township supervisor Bosserd and fire board member Albaugh about his concerns, both privately and along with others at Bosserd's farm. Bosserd, as the township supervisor, testified that the firefighters who attended the meeting at his farm with Albaugh all raised the same concerns as a group, which included the assertion that Jay was being inappropriately paid by the township. Dale also testified that he raised his concerns about Jay's dual employment and the conflicts of interest it created to Chief Riggs.

The trial court's assertion that it did not find any evidence that Chief Riggs actually violated the law through a misappropriation of township funds misstates a plaintiff's burden of proof under the WPA. It does not matter whether Dale was factually or legally correct that a violation of a rule or law occurred, because the WPA protects an employee who has reported, or is about to report, a *suspected* violation of law. *Henry*, 234 Mich App at 409. An employee does not lose protection if the allegation later turns out to be false or turns out not to amount to a legal violation. *Shallal*, 455 Mich at 610. Because there was evidence supporting Dale's assertion that he reported the possible misappropriation of township funds, he was engaged in a protected activity under the WPA. See *id*.

The trial court also erred when it concluded that Dale was not terminated because he reported a suspected violation of law. "A plaintiff may establish a causal connection through either direct evidence or indirect and circumstantial evidence." *Shaw v City of Ecorse*, 283 Mich App 1, 14; 770 NW2d 31 (2009). "Direct evidence is that which, if believed, requires the conclusion that the plaintiff's protected activity was at least a motivating factor in the employer's actions." *Id*. "To establish causation using circumstantial evidence, the circumstantial proof must facilitate reasonable inferences of causation, not mere speculation." *Id*. at 14-15 (quotation marks and citation omitted). "[T]he evidence presented will be sufficient to create a triable issue of fact if

the jury could reasonably infer from the evidence that the employer's actions were motivated by retaliation." *Id*. at 15.

Chief Riggs stated in the grievance document that he recommended Dale's termination because, since 2019, Dale had concerns about Jay working for both the city and as a township fire department officer and that he reported his concerns to township officials. The grievance document is direct evidence of retaliation because, in writing, Chief Riggs recommended Dale's termination because of Dale "not following chain of command by continually going over [Chief Riggs's] head and that of the Fire Board by going to a Township Board member." Albaugh, as a member of the fire board, also voted for Dale's dismissal, and Dale spoke directly to Albaugh about his concerns regarding Chief Riggs's misappropriation of funds. Accordingly, the trial court erred by ruling that Dale failed to present evidence of a causal connection between his protected activity and his termination. To the contrary, viewing the evidence in a light most favorable to Dale as the nonmoving party, Dale presented evidence to support a finding that the township terminated him because he engaged in a protected activity.

Because Dale established that he was engaged in a protected activity and that there was a causal connection between his protected activity and his termination, the trial court legally erred by holding that he failed to establish a prima facie case under the WPA. Accordingly, we reverse the trial court's grant of summary disposition to the township.

"Once a plaintiff establishes a prima facie case, a presumption of [retaliation] arises because an employer's adverse action is more likely than not based on the consideration of impermissible factors . . . if the employer cannot otherwise justify the adverse employment action." *Debano-Griffin v Lake Co Bd of Comm'rs*, 493 Mich 167, 176; 828 NW2d 634 (2013) (cleaned up). "The employer, however, may be entitled to summary disposition if it offers a legitimate reason for its action and the plaintiff fails to show that a reasonable fact-finder could still conclude that the plaintiff's protected activity was a 'motivating factor' for the employer's adverse action." *Id*. "[A] plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for [unlawful retaliation]." *Id*. (quotation marks and citation omitted; alterations in original).

Because the trial court ruled that Dale failed to establish a prima facie case, it dismissed Dale's claim without considering additional evidence that Dale's protected activity was at least a motivating factor in his termination. Chief Riggs testified that he also decided to terminate Dale's employment because Dale refused his direct order to meet with him to discuss the September 24, 2020 meeting. However, this factual issue remains in dispute because Dale explicitly testified that he agreed to meet with Chief Riggs, but Chief Riggs walked away and refused to speak when Dale insisted that a third party also attend the meeting. Moreover, although Chief Riggs cited Dale's "unfounded" accusation about comments Chief Riggs made to Marengo firefighters, Dale's assertion was affirmed by Koches's interview with Dale and two other township firefighters who were concerned that Chief Riggs's remarks would result in Marengo declining to call the township to assist in future calls. This also undermined Chief Riggs's assertion that *Dale* made negative comments about another fire department when Chief Riggs admitted he never confirmed who made the remarks. This evidence established a genuine issue of material fact that Chief Riggs's assertions about the reasons for his recommendation that Dale be terminated were mere pretext and that he was motivated to fire Dale because he reported his suspicious financial activity.

## C. STATUTE OF LIMITATIONS

Marshall Township argues on cross-appeal that the trial court should have granted its motion for summary disposition under MCR 2.116(C)(7) because Dale filed his complaint after the period of limitations expired.

As discussed, we review motions for summary disposition de novo. *Timko v Oakwood Custom Coating, Inc*, 244 Mich App 234, 238; 625 NW2d 101 (2001). As this Court explained in *Dextrom v Wexford Co*, 287 Mich App 406, 428-429; 789 NW2d 211 (2010):

> When reviewing a motion under MCR 2.116(C)(7), this Court must accept all well-pleaded factual allegations as true and construe them in favor of the plaintiff, unless other evidence contradicts them. If any affidavits, depositions, admissions, or other documentary evidence are submitted, the court must consider them to determine whether there is a genuine issue of material fact. If no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of those facts, the question whether the claim is barred is an issue of law for the court. However, if a question of fact exists to the extent that factual development could provide a basis for recovery, dismissal is inappropriate.

The period of limitations governing WPA actions, MCL 15.363(1), states that "[a] person who alleges a violation of this act may bring a civil action for appropriate injunctive relief, or actual damages, or both within 90 days after the occurrence of the alleged violation of this act."

Because Dale alleged that the termination of his employment violated the WPA, he was required to file his action within 90 days of his termination. See *Millar v Constr Code Auth*, 501 Mich 233, 240; 912 NW2d 521 (2018) (stating that "a claim for discriminatory discharge cannot arise until a claimant has been discharged") (quotation marks and citation omitted). The record evidence shows that the township officially terminated Dale at the December 17, 2020 fire board meeting, and he received a corresponding termination letter on December 20, 2020. Therefore, he was required to file his action within 90 days of December 17, 2020. Because he filed his initial complaint on February 26, 2021, the complaint was timely filed.

We disagree with the township's assertion that Chief Riggs actually terminated Dale by text message on October 9, 2020, or that the text was at least a threat of termination that would constitute a violation of the WPA. These arguments contradict the township's position at the December 17, 2020 meeting at which township attorney Koches explained that Chief Riggs did not have the authority to terminate Dale and that he only had the authority to make a recommendation that the fire board could either affirm or deny. As a result, Koches and Chief Riggs agreed that the October 9, 2020 text message operated as a suspension during which Dale received hazard pay and his monthly salary. Moreover, the township characterized the October 9, 2020 text message as a "recommendation" in its December 20, 2020 termination letter. As our Supreme Court stated in *Millar*,

> [I]n order for an actionable wrong under the WPA to have occurred, an employer must have done more than simply make a decision to discriminate against an employee. Instead, the employer must have taken an adverse employment action

against the plaintiff. It is the employer's action to implement the decision that triggers the running of the limitations period; not the decision itself. [*Id.* at 240-241.]

Because Dale was discharged on December 17, 2020, he timely filed his WPA claim and the trial court correctly denied the township's motion for summary disposition on this ground. See *id.* at 241.

### D. REMAND TO DIFFERENT JUDGE AND CIRCUIT COURT

Dale asks that we remand this case to a different judge in a different circuit court because Dale learned during discovery that Albaugh previously worked as a court administrator in Calhoun Circuit Court. Dale failed to preserve this issue for appeal by raising a claim of judicial bias in the trial court and, on appeal, he fails to present any evidence to support such a finding.

MCR 2.003 addresses judicial disqualification and, under MCR 2.003(B), "[a] party may raise the issue of a judge's disqualification by motion or the judge may raise it." MCR 2.003(C)(1) lists the following grounds in which the disqualification of a judge is warranted:

(a) The judge is biased or prejudiced for or against a party or attorney.

(b) The judge, based on objective and reasonable perceptions, has either (i) a serious risk of actual bias impacting the due process rights of a party as enunciated in *Caperton v Massey*, 556 US 868; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), or (ii) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct.

(c) The judge has personal knowledge of disputed evidentiary facts concerning the proceeding.

(d) The judge has been consulted or employed as an attorney in the matter in controversy.

(e) The judge was a partner of a party, attorney for a party, or a member of a law firm representing a party within the preceding two years.

(f) The judge knows that he or she, individually or as a fiduciary, or the judge's spouse, parent or child wherever residing, or any other member of the judge's family residing in the judge's household, has more than a de minimis economic interest in the subject matter in controversy that could be substantially impacted by the proceeding.

(g) The judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(*i*) is a party to the proceeding, or an officer, director, or trustee of a party;

(*ii*) is acting as a lawyer in the proceeding;

-12-

(*iii*) is known by the judge to have a more than de minimis interest that could be substantially affected by the proceeding;

(*iv*) is to the judge's knowledge likely to be a material witness in the proceeding.

"Apart from MCR 2.003(B)(1), as a general rule, a trial judge is not disqualified absent a showing of actual bias or prejudice." *Armstrong*, 248 Mich App at 597 (quotation marks and citation omitted).

Dale has not established any ground to disqualify the judge in this case under MCR 2.003. It is unclear how the fact that Albaugh served as a court administrator at some point while the trial judge was also serving on the court would affect the judge's ruling in this case. It is also unclear whether the judge was even aware that Albaugh was a former administrator. We find no grounds to remove the case to another county when Dale fails to explain why Albaugh's former employment would have any bearing on his case. Further, even though Albaugh, as a member of the fire board, was involved in the decision to terminate Dale, Chief Riggs, the other members of the fire board, and the township attorney were also involved in the process. Koches completed the investigation and presented his findings at a hearing, and all members of the fire board voted to terminate Dale's employment. Nothing suggests that Albaugh was solely or even primarily involved in Dale's termination. Accordingly, and because Dale has not shown any actual connection between Albaugh and the trial court judge, we hold that Dale is not entitled to relief on this issue.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Kristina Robinson Garrett
/s/ Anica Letica
/s/ Allie Greenleaf Maldonado

-13-